[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 125 
[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 126 
 On Application for Rehearing
The opinion of August 23, 1996, is withdrawn, and this opinion is substituted therefor.
The appellant, Joseph Wayne Campbell, was indicted on February 24, 1995, in 14 separate indictments, for the following offenses: 5 indictments charging rape in the second degree of T.S. (see § 13A-6-62, Code of Alabama 1975); 5 indictments charging sodomy in the second degree of T.S. (see § 13A-6-64); 2 indictments charging sexual abuse in the first degree of K.B. (see § 13A-6-66); and 2 indictments charging sexual abuse in the first degree of L.L. The trial court consolidated all 14 indictments for trial on motion of the state. The appellant was found guilty as charged in all 14 indictments and was sentenced to a total of 120 years imprisonment. The sentences consisted of 10 years' imprisonment for each of the 5 rape convictions and the 5 sodomy convictions, and 5 years' imprisonment for each of the 4 sexual abuse convictions. The trial court ordered that the sentences be served consecutively. The appellant raises four issues on appeal. He does not question on appeal the sufficiency of the evidence to support his convictions. Nevertheless, we have reviewed the evidence presented by the state, and find that it was sufficient to allow the jury to conclude beyond a reasonable doubt that the appellant was guilty of the crimes charged in all 14 indictments.
The three victims were students at Honeysuckle Middle School in Houston County, where the appellant was a teacher and a coach. The state's evidence showed, in reference to the alleged rapes and sodomies of T.S., that these offenses occurred between August 1992 and December 23, 1993. In 1989, T.S. was in the sixth grade in the Honeysuckle Middle School. She was enrolled in three of the appellant's classes and *Page 127 
was the manager of the basketball team, which he coached. During that year. T.S. began babysitting the appellant's son, and she continued to do so through her sixteenth birthday in 1993. When T.S. was in the seventh grade, she was a cheerleader and the appellant was the coach of the football team. In August 1992. T.S. was 14 years old and preparing to enter the ninth grade. She estimated that the appellant was then between 40 and 50 years of age. She testified that he had sexual intercourse with her on three occasions at his house while she was babysitting, and that on two other occasions, while driving her home after babysitting, he stopped the car and had sexual intercourse with her in his automobile. T.S. further testified that "at least five times," while driving her home after babysitting, the appellant stopped the car and performed cunnilingus on her. T.S. testified that on one such occasion, he coerced her to perform fellatio on him in his car.
In 1993 and 1994, K.B. and L.L. were enrolled in the eighth grade at Honeysuckle Middle School. They were in three classes taught by the appellant. K.B. and L.L. both testified that he would often ask them to stay after class to help around the classroom; that during class, on several occasions, the appellant pressed his erect penis against their buttocks; that although they tried to push him away, they were unable to do so; and that he also massaged their shoulders in class. K.B. further testified that the appellant touched her breasts and rubbed her crotch during class, and that he told her in the most vulgar terms that he would like to have sexual intercourse with her.
The appellant testified in his own behalf, denying any sexual involvement with the girls.
The appellant initially contends that the trial court erred by overruling his objection to the consolidation of the indictments for trial. Before trial, the state moved to consolidate the indictments pursuant to Ala. R.Crim.P. 13.3, arguing that the charged offenses were of the same or similar character or based on the same conduct or otherwise connected in their commission or alleged to have been a part of a common plan or scheme. The appellant objected, claiming that a consolidation would prejudice him, that the offenses were not of the same or similar character, that they were based on different conduct or were otherwise disconnected in their commission, and that they were not part of a common plan or scheme. After a hearing, the trial court granted the state's motion and ordered the consolidation of the 14 indictments for trial. The trial court gave no reason in its order for consolidating the cases, but stated at the conclusion of the hearing, "I am going to consolidate the cases that arise out of the similar circumstances and similar time frames and they should all be tried together."
Rule 13.3 (c), Ala.R.Crim.P., allows the consolidation of separate indictments for trial in one proceeding "if the offenses 1) share the same or similar characteristics, or 2) involve the same conduct or connection in their commission, or 3) are part of a common scheme." Yelder v. State, 630 So.2d 92, 95-96
(Ala.Cr.App. 1991), rev'd on other grounds, 630 So.2d 107 (Ala. 1992).[1] As we stated in Yelder, "perhaps the most important consideration is the answer to the following question: If the offense[s] were tried separately, would evidence of each offense be admissible in the trial for the other offense?" Id. at 96.
The state contends that, in this case, if the offenses were tried separately the collateral evidence of other bad acts allegedly performed by the appellant would be admissible in the trials of other offenses. It argues that this evidence of collateral acts would be admissible to show either a common plan or scheme undertaken by the appellant or the appellant's motive in committing these acts. The issue whether consolidation was proper in this case necessarily depends on whether this evidence would *Page 128 
be admissible in the individual trials of the offenses committed against each victim. The evidentiary rule[2] pertaining to the admissibility of evidence of collateral bad acts or crimes in the prosecution for a charged crime is set out as follows:
 "`"On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question."' Pope v. State, 365 So.2d 369, 371 (Ala.Cr.App. 1978), quoting C. Gamble, McElroy's Alabama Evidence § 69.01 (3d ed. 1977). `"This exclusionary rule is simply an application of the character rule which forbids the State to prove the accused's bad character by particular deeds. The basis for the rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors."' Ex parte Arthur, 472 So.2d 665, 668 (Ala. 1985), quoting McElroy's supra, § 69.01(1). Thus, the exclusionary rule serves to protect the defendant's right to a fair trial. `"The jury's determination of guilt or innocence should be based on evidence relevant to the crime charged."' Ex parte Cofer, 440 So.2d 1121, 1123 (Ala. 1983); Terrell v. State, 397 So.2d 232, 234 (Ala.Cr.App.), cert. denied, 397 So.2d 235 (Ala. 1981); United States v. Turnquitt, 557 F.2d 464, 468 (5th Cir. 1977).
 "`If the defendants commission of another crime or misdeed is an element of guilt, or tends to prove his guilt otherwise than by showing of bad character, then proof of such other act is admissible.' Saffold v. State, 491 So.2d 164
(Ala.Cr.App. 1986). The well-established exceptions to the exclusionary rule include: (1) relevancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Cr.App. 1984); Scott v. State, 353 So.2d 36 (Ala.Cr.App. 1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. `"Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government's case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects."' Averette v. State, 469 So.2d 1371, 1374 (Ala.Cr.App. 1985), quoting United States v. Turquitt, supra, at 468-69. `"`Prejudicial' is used in this phrase to limit the introduction of probative evidence of prior misconduct only when it is unduly and unfairly
prejudicial." [Citation omitted.] "Of course, `prejudice, in this context, means more than simply damage to the opponent's cause. A party's case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.'"' Averette v. State, supra, at 1374."
Robinson v. State, 528 So.2d 343, 347 (Ala.Cr.App. 1986) (emphasis in original).
In Alabama, the common plan, scheme, or design exception applies only *Page 129 
when identity is actually at issue. Register v. State,640 So.2d 3 (Ala.Cr.App. 1993), aff'd, 680 So.2d 225 (Ala. 1994). However, the appellant's defense was a denial that the sexual misconduct occurred. See Mothershed v. State, 596 So.2d 47 (Ala.Cr.App. 1991). He did not suggest someone else had committed it, and the evidence adduced at trial did not necessarily make identity an issue. Compare Watson v. State, 538 So.2d 1216, 1220
(Ala.Cr.App. 1987) ("Under the facts before us, one being the prosecutrix's pregnancy [resulting in a birth] approximately nine months after the alleged offense, it cannot be argued that the charged act never occurred; thus the evidence presented a `real and open' issue concerning who raped the prosecutrix."). The issue of identity was not presented in the instant case. Therefore, the common plan, scheme, or design exception to the general exclusionary rule is inapplicable in this case. SeeMothershed.
The state argues that the evidence of the charged offenses would be admissible in the trials of any of the other charged offenses as tending to show the appellant's motive. For guidance on this issue, we turn to the latest pertinent expression by the Alabama Supreme Court. In Ex parte Register, 680 So.2d 225 (Ala. 1994), Register was charged with having committed various sexual offenses against his two minor stepdaughters. The trial admitted evidence of prior sexual offenses that Register had allegedly committed seven to nine years earlier against his natural daughter. In deciding the issue whether "evidence that a defendant has a passion or propensity for sexual misconduct is material and relevant as tending to establish the defendant's motive for perpetuating the crime for which he or she is being tried," 680 So.2d at 227, the Supreme Court stated:
 "`Motive is an inducement, or that which leads or tempts the mind to do or commit the crime charged.' Spicer v. State, 188 Ala. 4, 26, 65 So. 972, 977
(1914). Motive is `that state of mind which works to "supply the reason that nudges the will and prods the mind to indulge the criminal intent."' C. Gamble, Character Evidence [:A Comprehensive Approach,] at 42 [(1987)]. `Furthermore testimony offered for the purpose of showing motive is always admissible. It is permissible in every criminal case
to show that there was an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.' (Emphasis in original, citations omitted.) Bowden v. State, 538 So.2d 1226, 1235 (Ala. 1988).
". . . .
 "There is another reason why the evidence was admissible here. The record reveals that there was a resemblance between the sexual misconduct with which Register was charged and the prior collateral acts as to which evidence was admitted. Register's natural daughter, L.R., testified that Register's sexual abuse always began with massages. Likewise, Register's two stepdaughters testified that Register would massage them before sexually abusing them. Therefore, the testimony of Register's acts against his natural daughter `are so connected by circumstances with the particular crime in issue as that the proof of one fact with its circumstances has some bearing upon the issue on trial other than to show the defendant's bad character or moral delinquency.' Brasher v. State, 249 Ala. 96, 100, 30 So.2d 31, 35 (1947) (emphasis added) (citations omitted).
 "Under the facts of this case, we conclude that the trial court did not abuse its discretion in permitting evidence of Register's collateral sexual misconduct committed upon his natural daughter, because that evidence had some tendency to show that Register had a passion or propensity for unusual and abnormal sexual relations. C. Gamble, Character Evidence, supra, at 45-46."
680 So.2d at 227-28.
It is important to note the distinction between "motive" and "intent" in a case involving a sexual offense because "neither rape nor sodomy are specific intent crimes, see Ala. Code 1975, §§ 13A-6-62, -63, and -64, and the intent necessary for sexual abuse `may be inferred by the jury from the act itself.' Ex parteCofer, 440 So.2d 1121, 1124 (Ala. 1983)." Register, 640 So.2d at 5. As our *Page 130 
Supreme Court stated in Fuller v. State, 269 Ala. 312, 336,113 So.2d 153 (1959), cert. denied, 361 U.S. 936, 80 S.Ct. 380,4 L.Ed.2d 358 (1960) (quoting Harden v. State, 211 Ala. 656,101 So. 442 (1924)):
 "`[Motive and intent] are not the same in law. "Intent" is the ripened purpose to effect a result; while "motive" is the moving power which leads the mind to desire the result and form the purpose. The intent must exist in all cases. If a crime is clearly shown to have been committed by the accused, as in case of one intentionally and without cause striking a deadly blow with an axe, the question of motive would be of little importance. But where the direct evidence is in conflict as to whether the accused did the act, or is partially or wholly circumstantial upon that issue, the question of motive becomes a leading inquiry.'"
Considering that the appellant denied that the offenses ever occurred, the issue of motive became "a leading inquiry." However, in weighing the relevancy of evidence to prove "the material `other purpose(s)' for which it is offered in a sex crime prosecution," Bowden v. State, 538 So.2d 1226, 1237 (Ala. 1988), the following factors are to be considered: "(1) the offense(s) charged; (2) the circumstances surrounding the offense(s) charged and the collateral offense(s); (3) the other collateral evidence offered at trial, and (4) the other purpose(s) for which it is offered." Id. at 1237-38. See also Exparte Hatcher, 646 So.2d at 678.
Had the offenses against each victim been tried separately, would the collateral evidence of the appellant's collateral bad acts been admissible to show his motive in committing the offenses for which he was being tried, i.e., was the evidence of the collateral offenses relevant for proving some material "other purpose"?
First, the appellant was charged with multiple offenses arising out of his alleged sexual molestation of minor female children: five indictments charging second-degree rape of T.S.; five indictments charging second-degree sodomy of T.S.; two indictments charging first-degree sexual abuse of K.B.; and two indictments charging first-degree sexual abuse of L.L. The three victims were students in the appellant's classes, and all testified that the appellant sexually assaulted them in one way or another.
In regard to the circumstances surrounding the offenses, we note the following: The appellant committed the rapes and sodomies of T.S. while she was babysitting the appellant's son. They first met when she was his student, and she helped him in many after-school activities. She testified that while she was one of his sixth-grade students, he often talked to her in sexually explicit terms and touched her buttocks, vagina, and breasts. Many of his initial sexual advances were associated with school activities. He would walk by her in school and intentionally pat her on the buttocks; he would lean over her and put his hand over her hand; he would tell her that she was more mature and was "real pretty" and that he loved her; and he would ask if she loved him. This behavior was noticed by other teachers. One testified that the appellant treated T.S. not as a student, but as a peer; that she saw the appellant standing very close to T.S. also "rubbing around" her; and that she saw him "playing hands" with T.S. in his office. During the approximately 10 times that the appellant took T.S. home from basketball practice, the appellant would begin massaging one of her shoulders or legs. The sexual advances also occurred when the appellant took T.S. home after T.S.'s babysitting and when T.S. was vacationing with the appellant's family as the children's babysitter. Sometimes when he took T.S. home from babysitting, he would tell her to lie down in his lap or to let him massage her buttocks, back, or legs. On the first beach vacation during which T.S. went along as babysitter, which was the summer after T.S. finished the sixth grade, the appellant went into T.S.'s bedroom and began massaging her foot, continuing up to her vaginal area where he inserted "a part of his hand" into her vagina. When she reacted negatively to his advances, he acted as if nothing had happened. On another trip to the beach after T.S. finished the seventh grade, the appellant massaged her legs and back, touched her private parts, and put his fingers into her vaginal opening. *Page 131 
In August 1992, after T.S.'s graduation from Honeysuckle Middle School, the appellant initiated sexual contact by rubbing her leg. This misconduct culminated with sexual intercourse. She was 14 years old at the time. The appellant had sexual intercourse with T.S. at least nine more times before her sixteenth birthday. On one occasion, he videotaped their activity. He also orally sodomized her at least fives times before she turned 16 and pursuant to his request she performed oral sodomy on him.
As for the alleged sexual assaults against K.B. and L.L., these incidents all occurred while the minor victims were students in the appellant's classes and between the ages of 12 and 14. Both K.B. and L.L. testified that the appellant made sexual advances toward them during class, that the appellant would ask them to "help" him after class, and that he would then touch them in inappropriate areas, would speak to them using sexually explicit terms, and promised to give them A's without requiring them to perform the assigned work. A teacher testified that she saw the appellant get "real close" to K.B., and that she also saw him rub his pelvic area against K.B. When this teacher talked with K.B., K.B., indicated that nothing had happened, because, as K.B. later explained, she was afraid and the appellant had told her that he would lose his family and his job.
In addition, the prosecution offered the testimony of R.P., another student at Honeysuckle Middle School. Although R.P. was not physically assaulted by the appellant, she testified that the appellant asked her on numerous occasions to babysit for him, that he would often "rub her back," and would often speak to her about sexual matters. Further, R.P. testified that the appellant telephoned her at home on several occasions and asked her to babysit for his children. R.P. stated that the appellant told her to call him "Joe" and that he once told her, `You know this really isn't a babysitting job." R.P.'s mother also testified that; the appellant called their house on numerous occasions and that he would either hang up if an adult answered the telephone or ask for her daughter by her nickname. She identified the caller as the appellant, using a device that allowed her to view the telephone number of the incoming call. On one occasion, R.P.'s mother called the appellant back and confronted him. She told the appellant that she did not think that it was a good idea to telephone students at home, and she asked him not to call their house in the future unless he wanted to speak with her parents. The prosecutor also introduced the testimony of Harold Yates, the school's campus monitor, to the effect that by the appellant's body movement and candor during a conversation, Yates believed that the appellant was asking him if he would like to have a sexual liaison with a certain student. Yates also testified that the appellant had asked him who R.P. was after finding out that she had left a basketball game with "a number of young males."
In each situation, the appellant used his position as a teacher and a coach to approach and influence or dominate minor female students, i.e., to "groom" them for the abuse. Moreover, testimony showed that the appellant, acting in his professional capacity, approached minor female students in his class, and engaged them in a similar course of conduct; he would ask them to help after class or befriend them in school-related activities; he would make sexually explicit comments to them; he would touch them in inappropriate places, i.e., shoulders, buttocks, breasts, and vaginal area; and he would often ask young female students to babysit in order to have the opportunity to assault them. The similarities of the appellant's approach to each of the victims, the victim's young ages, their subsequent silence, and the actual sexual nature of the offenses are appropriate to show motive. Exploiting his professional position in relation to the victims, the appellant used the same coercive system on the victims, over whom he had control and dominion, to fulfill a common scheme, which was to satisfy his desires for unusual and abnormal sexual relations. Finally, it is noteworthy that the appellant was cultivating improper relationships with K.B. and L.L. around the time that T.S. ceased cooperating with him. The later offenses against K.B. and L.L. were the appellant's continuing effort to satisfy his desire for abnormal sexual relations, i.e., his motive. Under the facts of this case, "the question of *Page 132 
motive bec[a]me a leading inquiry." Fuller, 269 Ala. at 336,113 So.2d at 175.
We recognize that the most recent cases holding that evidence of a collateral sex offense was admissible under the particular facts as relevant to prove motive involved the molestation by the accused of his children or stepchildren, see Register, Bowden, and Atkisson v. State, 640 So.2d 33 (Ala.Cr.App. 1993), or the molestation by the accused of essentially his foster-children, see Hatcher (the victims were sisters and orphans, the accused was their brother-in-law, and the victims both lived in the appellant's household).[3] However, we do not think that the Alabama Supreme Court intended to constrain these cases to allow for the admission of evidence of collateral sex offenses as relevant to motive only in those cases involving victims and an accused who are part of a single household or family unit. Rather, the uniformity of precedent appears to indicate that in considering the relevance of one sex offense to show motive for another, the inquiry turns, not only on the similarity of the acts themselves, but also on the similarity of the relationships between the accused and the victims.
In this case, the offenses committed by the appellant bear "a resemblance," Ex parte Register, 680 So.2d at 228, to each other and they could be used to show the appellant's motive, or his unnatural lust for young female students under his authority. Because evidence of motive is always admissible and because the evidence of the offenses "had some tendency to show that [the appellant] had a passion or propensity for unusual and abnormal sexual relations," id., we cannot say that the trial court abused its discretion in allowing admission of this evidence or in consolidating the indictments against the appellant into a single criminal trial.
The appellant contends that the trial court erred in overruling his motion for a change of venue. He alleges that there was significant pretrial publicity in Houston County concerning the allegations made by the state against him, and that that publicity resulted in an unfair trial. In Ex parte Grayson,479 So.2d 76, 80 (Ala.), cert. denied, 474 U.S. 865, 106 S.Ct. 189,88 L.Ed.2d 157 (1986), the Alabama Supreme Court articulated the standard to be utilized in determining whether to grant a criminal defendant's motion for a change of venue because of extensive media coverage surrounding the criminal proceedings.
 "Absent a showing of abuse of discretion, a trial court's ruling on a motion for change of venue will not be overturned. Ex parte Magwood, 426 So.2d 929, 931 (Ala.), cert. denied, 462 U.S. 1124, 103 S.Ct. 3097, 77 L.Ed.2d 1355 (1983). In order to grant a motion for change of venue, the defendant must prove that there existed actual prejudice against the defendant or that the community was saturated with prejudicial publicity. Sheppard v. Maxwell, 384 U.S. 333, 86 S.Ct. 1507, 16 L.Ed.2d 600 (1966); Franklin v. State, 424 So.2d 1353 (Ala.Crim.App. 1982). Newspaper articles or widespread publicity, without more, are insufficient to grant a motion for change of venue. Anderson v. State, 362 So.2d 1296, 1298 (Ala.Crim.App. 1978). As the Supreme Court explained in Irvin v. Dowd, 366 U.S. 717, 723, 81 S.Ct. 1639, 1642-43, 6 L.Ed.2d 751 (1961):
 "`To hold that the mere existence of any preconceived notion as to the guilt or innocence of an accused, without more, is sufficient to rebut the presumption of a prospective juror's impartiality would be to establish an impossible standard. It is sufficient if the juror can lay aside his impression or opinion and render a verdict based on the evidence presented in court. . . .'
 "The standard of fairness does not require jurors to be totally ignorant of the facts and issues involved. Murphy v. Florida, 421 U.S. 794, 799-800, 95 S.Ct. 2031, 2035-36, 44 L.Ed.2d 589 (1975). Thus, `[t]he proper manner for ascertaining whether adverse publicity may have *Page 133 
biased the prospective jurors is through the voir dire examination.' Anderson v. State, 362 So.2d 1296, 1299 (Ala.Crim.App. 1978)."
479 So.2d at 80. See also Rule 10.1 (b), Ala. R.Crim.P. (the burden of proof is on the accused "to show to the reasonable satisfaction of the court that a fair and impartial trial and an unbiased verdict cannot be reasonably expected in the county in which the defendant is to he tried"). According to Grayson, there are two tests that can be applied to determine whether a motion for a change of venue should be granted: 1) whether the criminal defendant has proved that he or she was actually prejudiced by pretrial publicity or 2) whether the relevant community was so saturated with pretrial publicity that it can be said that the defendant could not receive a fair trial. Id.
We first consider whether the appellant can show that he was actually prejudiced by the pretrial publicity surrounding this case. To answer this question, we look to the transcript of the voir dire examination of the jury venire to determine the effect of the pretrial publicity on the prospective jurors. Harris v.State, 683 So.2d 26 (Ala.Cr.App. 1996). Absent a showing of an abuse of discretion by the trial court, we will not reverse a criminal conviction based on the denial of a motion for change of venue. Newsome v. State, 570 So.2d 703 (Ala.Cr.App. 1989).
A review of the transcript of the jury voir dire examination shows that only 19 veniremembers out of 40 responded that they had heard anything about the case through media coverage. Of those 19, 2 stated that they were convinced that the appellant had committed the alleged sexual offenses and that they could not be impartial in rendering a verdict. These two members were dismissed for cause. The remaining 17 veniremembers stated that they knew that the allegations had been made, but that they did not have an opinion about the guilt or innocence of the appellant and that they could render an impartial verdict if asked to serve as jurors in this trial.[4]
Although the appellant contends that a review of the transcript of the voir dire examination shows that he was actually prejudiced by the pretrial publicity, we can find no evidence in the record to support his claim. The trial court excused the two potential jurors who stated that they could not be objective in rendering a verdict. The responses given by the remaining potential jurors who admitted that they had been exposed to media coverage about the appellant's case and the charges against him indicated that they could lay aside what they had read or heard and be impartial and fair. Accordingly, we find that the trial court was well within its discretion in finding that the appellant failed to prove that he was actually prejudiced by pretrial publicity.
In regard to the question whether the media coverage of the appellant's criminal trial was so pervasive as to make it impossible for him to receive a fair trial in Houston County, we note the following, stated in Oryang v. State, 642 So.2d 979, 983
(Ala.Cr.App. 1993):
 "[A] change of venue must be granted only when it can be shown that the pretrial publicity has so `pervasively saturated' the community as to make the `court proceedings nothing more than a "hollow formality,"' Hart v. State, 612 So.2d 520, 526-27
(Ala.Cr.App.), aff'd, 612 So.2d 536 (Ala. 1992), cert. denied, 508 U.S. 953, 113 S.Ct. 2450, 124 L.Ed.2d 666 (1993), citing Rideau v. Louisiana, 373 U.S. 723, 726, 83 S.Ct. 1417, 1419, 10 L.Ed.2d 663
(1963). . . . In order to show community saturation, the appellant must show more than the fact `that a case generates even widespread publicity.' Thompson v. State, 581 So.2d 1216, 1233 (Ala.Cr.App. 1991), cert. denied, 502 U.S. 1030, 112 S.Ct. 868, 116 L.Ed.2d 774 (1992). `"Newspaper articles alone would not necessitate a change of venue unless it was shown that the articles so affected the general citizenry through the insertion of such sensational, *Page 134 
accusational or denunciatory statements, that a fair and impartial trial was impossible. Patton v. State, 246 Ala. 639, 21 So.2d 844 [(1946)]."' Thompson v. State, supra, at 1233, quoting McLaren v. State, 353 So.2d 24, 31 (Ala.Cr.App.), cert. denied, 353 So.2d 35 (Ala. 1977)."
The appellant argues that there was so much pretrial publicity surrounding his case that he could not receive a fair trial. He cites from the record the evidence that he presented in support of his change of venue motion. This evidence includes excerpts from newspaper articles and television broadcasts, which outlined the allegations and charges against him. These news reports stated that the appellant had been accused of having sexual relations with a 16-year-old student and that he had been indicted for sexually harassing 2 former students.
After reviewing the record, we find that the appellant failed to meet his burden of proving that the pretrial publicity made it impossible for him to receive a fair and impartial trial. A reading of the materials presented at the hearing on the motion for a change of venue leads us to conclude that, although there was substantial pretrial publicity about the case in Houston County, none of it could be considered "sensational, accusational or denunciatory." While it is obvious that there was considerable public interest in the appellant's case, the publicity consisted of straightforward, factual accounts of what was taking place.
We find nothing in the record to suggest that the jurors could not or did not render a verdict based solely on the evidence presented at trial. Further, we find no abuse of the trial court's discretion in denying the motion for a change of venue. There is no merit in the appellant's contention.
 III.
The appellant contends that the trial court committed reversible error by denying his motion to suppress tape-recordings of telephone conversations between him and T.S. He contends that T.S. was acting as an agent of the law enforcement officers when she telephoned him and engaged him in conversation. He argues that the recordings were inadmissible because he was not advised of his Miranda v. Arizona, 384 U.S. 436,86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), rights before being engaged by T.S. in the telephone conversations and also because his statements during their conversations were obtained by the agent of the state engaging in deception or trickery in violation of his constitutional rights under the Fifth and Sixth Amendments.
The evidence shows that on December 15, 1994, T.S.'s father and Sergeant Brian Brackin of the Dothan Police Department obtained warrants in the District Court of Houston County for the arrest of the appellant for the crimes charged in the instant case; that as soon as the warrants were obtained, Sergeant Brackin proceeded to the Dothan police headquarters where he met T.S., her mother, and a friend of T.S.'s mother; that at the suggestion of the police and with the voluntary cooperation of T.S. and her mother, T.S. placed telephone calls from the police headquarters to the appellant at his home; that T.S. and Sergeant Brackin were alone in a room at the police headquarters when the calls were made; that the telephone conversations were recorded by equipment furnished by the police; and that the appellant made statements to T.S. during the telephone conversations that were against his interest and arguably incriminating. Sergeant Brackin testified at the suppression hearing that he made no suggestions to T.S. as to what questions to ask the appellant during the telephone conversations; however, it is apparent from the evidence that the telephone calls were suggested and arranged by the police with the cooperation of T.S., with the hope that the appellant would make incriminating statements. Although Sergeant Brackin had the warrants for the appellant's arrest at the time of the telephone conversations, he did not execute the warrants until the following day.
Miranda warnings are required only when a suspect is in custody and is subjected to interrogation by a law enforcement officer.Miranda, 384 U.S. at 477-78, 86 S.Ct. at 1629-30; Cure v. State,600 So.2d 415 (Ala.Cr.App.), cert. denied, 600 So.2d 421 *Page 135 
(Ala. 1992); Perkins v. State, 574 So.2d 988 (Ala.Cr.App. 1990);Molina v. State, 533 So.2d 701 (Ala.Cr.App. 1988). The coercion against which Miranda was designed to protect can occur only through the interaction of these two elements. Illinois v.Perkins, 496 U.S. 292, 110 S.Ct. 2394, 110 L.Ed.2d 243 (1990).
 "`The Miranda warnings are not required simply because the questioned person is one whom the police suspect or one on whom the investigation has focused. Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977); Beckwith v. United States, 425 U.S. 341, 96 S.Ct. 1612, 48 L.Ed.2d 1 (1977); Malone v. State, 361 So.2d 671 (Ala.Cr.App.), cert. denied, 361 So.2d 691 (Ala. 1978). The "[c]riteria used to determine the necessity of Miranda safeguards include: probable cause to arrest, subjective intent of the police, subjective belief of the defendant, and focus of the investigation. Especially important is whether the focus of the investigation had finally been centered on the accused." Harrison v. State, 358 So.2d 759, 761 (Ala.Cr.App. 1977), reversed on other grounds, 358 So.2d 763 (Ala. 1978). While investigative focus is especially significant, it is custody and not focus which marks the point at which the Miranda warnings become mandatory. Mathiason, supra.'"
Perkins v. State, 574 So.2d 988, 990 (Ala.Cr.App. 1990), cert. denied, 574 So.2d 988 (Ala. 1991) (quoting Harris v. State,376 So.2d 773, 774 (Ala.Cr.App.), cert. denied, 376 So.2d 778 (Ala. 1979)). A person is in custody if he or she has been deprived of freedom of action in any significant way. Miranda,384 U.S. at 444, 86 S.Ct. at 1612. In determining whether a suspect is in custody, a court must examine the totality of the circumstances of the situation using the perspective of a reasonable person in the suspect's position. Stansbury v. California, 511 U.S. 318,114 S.Ct. 1526, 128 L.Ed.2d 293 (1994); Berkemer v. McCarty,468 U.S. 420, 104 S.Ct. 3138, 82 L.Ed.2d 317 (1984); California v.Beheler, 463 U.S. 1121, 103 S.Ct. 3517, 77 L.Ed.2d 1275 (1983). Interrogation, within the meaning of Miranda, is "express questioning or its functional equivalent." Rhode Island v. Innis,446 U.S. 291, 300-01, 100 S.Ct. 1682, 1689, 64 L.Ed.2d 297
(1980). The functional equivalent of interrogation consists of "words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. "Psychological ploys" designed to elicit incriminating responses may under some circumstances constitute interrogation. Arizona v. Mauro, 481 U.S. 520, 526,107 S.Ct. 1931, 1934-35, 95 L.Ed.2d 458 (1987).
The trial court denied the appellant's motion to suppress the recording of the telephone conversations, holding that Miranda
warnings were not required before he was engaged in the telephone conversations because the appellant was not in custody at the time: the trial court stated that "it does not meet the custody requirement." In arguing the issue to the trial court during the suppression hearing, the appellant's counsel conceded that the appellant was not in custody at the time when he talked with T.S. on the telephone. Based on the record, we concur with the trial court's ruling: the appellant was not in custody when he engaged in the telephone conversations with T.S.; therefore, Miranda
warnings were not required. At the time of the conversations, the appellant was in his own home, had no knowledge that warrants had been issued for his arrest, was under no pressure or coercion from the police, and had not been deprived of his freedom of action in any significant way. Not only was he not in custody, no reasonable person in the appellant's position would believe that he was in custody, despite the fact that he may have been aware that he was under investigation.
While T.S. may have been acting as an agent of the law enforcement officers in making the calls, and while her questioning of the appellant about their relationship may have been the functional equivalent of interrogation under the circumstances here, we find it unnecessary to decide these questions in resolving the issue before us. For Miranda to apply there must be both "custody" and "interrogation," and here, clearly, there was no custody. *Page 136 
Furthermore, the appellant's contention that the state's alleged use of trickery and deception in arranging the telephone conversations between him and T.S. violated his Fifth and Sixth Amendment rights is without merit. Alabama follows the general rule that a confession is not inadmissible merely because it was induced by a trick or misrepresentation that was not reasonably calculated to lead the accused to confess falsely. Fincher v.State, 211 Ala. 388, 100 So. 657 (1924); Bates v. State,549 So.2d 601 (Ala.Cr.App. 1989); Barrow v. State, 494 So.2d 834
(Ala.Cr.App. 1986); 2 C. Gamble, McElroy's Alabama Evidence § 200.07 (7) (5th ed. 1996). Any alleged misrepresentation, under the circumstances here, could not reasonably have led the appellant to confess falsely. We find that the appellant's statements over the telephone were made voluntarily. There was no coercive police activity that would have affected his rational intellect and free will.
We find no error in the admission of the recordings of the telephone conversations. The trial court's denied of the motion to suppress was proper.
 IV.
The appellant contends that Alabama's second-degree rape statute, § 13A-6-62, is unconstitutional because, he argues, it denies him equal protection of the law guaranteed under the Fourteenth Amendment of the United States Constitution and the Alabama Constitution. As we have heretofore stated, he stands convicted in this case on, among other offenses, five separate indictments for second-degree rape. He correctly points out that in Baynes v. State, 423 So.2d 307 (Ala.Cr.App. 1982), we upheld § 13A-6-62 against an identical equal protection attack. However, he argues that the circumstances existing at the time we decided Baynes and upon which we based our decision in that case no longer exist, and he urges us to revisit our decision in that case.
We held in Baynes that the second-degree rape statute, even though gender-based, does not violate the Equal Protection Clause or any other constitutional provision because the state has "a vital interest in the protection of its society, and the protection of young girls from the consequences that usually follow from the pregnancy of its young girls." 423 So.2d at 310. We found that even though the statute singles out males for more severe punishment than that provided for females who commit a similar crime, the gender-based classification is reasonable, is not arbitrary, and rests upon a ground of difference having a fair and substantial relationship to the objective of the legislation. Id. We noted in Baynes that this court, as well as the United States Supreme Court, had previously passed upon similar statutes and held them to be valid and not in violation of the Fourteenth Amendment. See Michael M. v. Superior Court ofSonoma County, 450 U.S. 464, 101 S.Ct. 1200, 67 L.Ed.2d 437
(1981); Reed v. Reed, 404 U.S. 71, 92 S.Ct. 251, 30 L.Ed.2d 225
(1971); Smith v. State, 409 So.2d 455 (Ala.Cr.App. 1981); Hall v.State, 365 So.2d 1249 (Ala.Cr.App. 1978), cert. denied,365 So.2d 1253 (Ala. 1979).
In support of his contention that "times have changed" since we decided Baynes in 1982, the appellant argues that the "physical, emotional, and psychological consequences women suffered from unwanted pregnancies in 1981 are not of the same character or degree today"; that the state's health care services are available today for unwanted pregnancies; and that the primary concern today of participants in sexual intercourse whether consensual or non-consensual, is not pregnancy, but contracting Human Immunodeficiency Virus (HIV), which is not unique to the female population, but of equal concern to the male population. In support of his argument, he also points out that our sodomy statutes are not gender-based, but treat males and females alike.
We have considered the appellant's arguments and are not persuaded to change our opinion in Baynes. He fails to convince us that the original basis for the gender classification in the statute has changed. We reaffirm our holding in Baynes.
For the foregoing reasons, the judgment of the trial court is due to be, and it is hereby, affirmed.
The foregoing opinion was prepared by Retired Appellate Judge John Patterson *Page 137 
while serving on active duty status as a judge of this court under the provisions of § 12-18-10 (e), Ala. Code 1975.
OPINION OF AUGUST 23, 1996, WITHDRAWN; OPINION SUBSTITUTED; APPLICATION FOR REHEARING GRANTED; RULE 39 (k) MOTION DENIED; AFFIRMED.
McMILLAN, COBB, and BASCHAB, JJ., concur.
LONG, P.J., recuses himself.
BROWN, J., not sitting.
[1] Yelder concerned the joinder of multiple offenses in one indictment, as opposed to consolidation of multiple indictments in one trial. However, Rule 13.3(c) Ala.R.Crim.P., states that consolidation is allowed "if the offenses . . . could have been joined in a single indictment information or complaint."
[2] This rule is now incorporated in Rule 404 (b) Ala.R.Evid, which became effective for proceedings beginning on or after January 1, 1996.
[3] This court's opinion in Mothershed v. State, 596 So.2d 47
(Ala Cr.App. 1991), does not indicate the relationships between the victims and the defendant.
[4] The trial court subsequently excused 7 of these 17 on challenges for cause unrelated to their responses concerning pretrial publicity. *Page 658