COBB, Judge,
dissenting.
I respectfully dissent from the majority’s unpublished memorandum which holds the State met its burden of proof in showing that J.D.H. voluntarily waived his privilege against self-incrimination when he made a statement to police investigators after he declined to take a polygraph test. Agreeing to take a polygraph examination ordinarily would not run afoul of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). However, this case presents a disturbing situation — there was a 16-day lapse between the time J.D.H. was advised of his Miranda rights and his “session” with the polygrapher. During that 16-day interval, J.D.H. was incarcerated. Following his meeting with the po-lygrapher, J.D.H. ultimately confessed. The majority does not encourage this type of investigatory gymnastics, but ultimately its decision to affirm condones it. I, on the other hand, believe these gymnastics warrant reversal. Therefore, I respectfully dissent.
J.D.H. was arrested for first-degree sodomy and first-degree sexual abuse and was taken into custody on November 6, 1996. Before a custodial interrogation on that day J.D.H. was advised of his Miranda rights; he waived those rights and agreed to talk with police investigators. He did not make any incriminating statements to the police that day, but he agreed to submit to a polygraph examination. J.D.H. was put in jail after the interview, where he stayed, uncounseled, until November 22, 1996. On November 22, he was brought by police to a jury room in the courthouse, where Lt. Ken Mays, a polyg-rapher from the Alabama Bureau of Inves *1127 tigation, met him to conduct a polygraph examination.
Lt. Mays, without ever advising J.D.H. of his Miranda rights, proceeded to conduct a pre-polygraph interview, which included having J.D.H. complete a written questionnaire in a “pretest booklet” as a prerequisite to taking the polygraph. This written questionnaire included such questions as:
“We have reached the determination that you have been accused of placing your penis in [the victim’s] mouth. How would you explain this? Please write in detail your ideas that would account for this.
“List the 5 most important causes that could have created this situation. “Describe in detail the events of the last time [the victim] stayed at your residence, from the moment you awoke, until you went to sleep that night.
“Do you know who put their penis in [the victim’s] mouth?
“Did you put your penis in [the victim’s] mouth?
“Did you take part in putting your penis in [the victim’s] mouth?”
(C. 32-39.)
After Lt. Mays reviewed J.D.H.’s exculpatory answers and denials provided in the “pretest booklet,” he then engaged in a conversation with J.D.H. According to Lt. Mays, the conversation was as follows:
“I advised [J.D.H.], as I do all people who are prior to taking a polygraph, that I didn’t know whether he was, at that point — whether he was guilty of the act that he was accused of or not. That, in my opinion, I would know within 30 minutes to an hour, if he took the polygraph. At that point, I advised [J.D.H.] that, if he were guilty of the act that he was accused of, that it would be my advice to him not to take the polygraph. But if he was not guilty of the act that he was accused of, in my opinion, he should take the polygraph.
“At that point, I asked [J.D.H.] if he was prepared to take the polygraph examination .... [I]f he had been prepared and advised me that he was prepared, I would have — the next step is to get him to fill out a polygraph form which includes a waiver of rights and things of that nature. However, he said that, based on my recommendation, he didn’t want to take the polygraph. At that point, I told him, in my best judgment, he needed — we needed to call the investigator back in the room then and he needed to talk to the investigator. And I asked him if he wanted to do that, and he said he did.”
(R. 51-52.)
According to Steve Rogers, an investigator for the Winston County Sheriffs Department who was waiting outside the room, Lt. Mays contacted him and “He told me that I needed to sit down and talk to [J.D.H.], that he had confessed.” (R. 16.) Investigator Rogers then, without advising J.D.H. of his Miranda rights, conducted an interrogation that resulted in J.D.H.’s confession.
In Hollander v. State, 418 So.2d 970, 972 (Ala.Cr.App.1982), this court stated:
“It is well settled that once Miranda warnings have been given and a waiver made, a failure to repeat the warnings before a subsequent interrogation will not automatically preclude the admission of an inculpatory response. Fagan v. State, 412 So.2d 1282 (Ala.Cr.App.1982); Smoot v. State, 383 So.2d 605 (Ala.Cr.App.1980). Whether the Miranda warnings must be repeated depends on the facts of each individual case, with the lapse of time and the events which occur between interrogation being relevant factors to consider. Fagan v. *1128 State, supra; Jones v. State, 47 Ala.App. 568, 258 So.2d 910 (1972).”
I disagree with the majority’s conclusion that, standing alone, a 16-day lapse between an advisement of rights and a custodial interrogation does not make the appellant’s statement inadmissible. I believe this 16-day period well exceeds a permissible length of time between an advisement of rights and any sort of custodial interrogation. See Allen v. State, 53 Ala.App. 66, 297 So.2d 391 (Ala.Cr.App.1974)(three weeks lapse between a rights advisement and a confession, during which the appellant was confined in jail, coupled with factor of police coercion rendered the appellant’s confession inadmissible). There must come a time when, because of the sheer length of time between when a defendant is advised of his rights and when a defendant is interrogated, the rights advisement becomes so stale as to be completely meaningless. To me, this is such a case.
However, I need not even reach that conclusion here because I believe the troubling circumstances used in obtaining J.D.H.’s confession, when combined with the 16-day time lapse, make the statement to the investigator involuntary and, thus, inadmissible. I strongly disagree with the majority’s conclusion that Lt. Mays’s actions were not designed to elicit an incriminating response from the appellant. It is apparent to me that the polygrapher’s entire pretest procedure was designed for just one purpose: to elicit an incriminating response.
The United States Supreme Court in Rhode Island v. Innis, 446 U.S. 291, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980), stated that interrogation “refers not only to express questioning, but also to any words or actions on the part of the police ... that the police should know are reasonably likely to elicit an incriminating response from the suspect.” 446 U.S. at 301. The investigative techniques employed by Lt. Mays in “preparing” J.D.H. for his polygraph examination fall within the category of interrogation. The pretest questionnaire asked direct, accusatory questions, which, had J.D.H. answered affirmatively rather than negatively, would have resulted in a confession prior to the administration of the polygraph test. Likewise, the investigation technique of setting J.D.H. in a room filled with the polygraph equipment, having him take a written pretest examination in which he again denied any criminal culpability, and then telling him that within 30 minutes after the polygraph the police would know whether he was guilty or not, was designed to overwhelm him. Thus, I am convinced that the gratuitous “advice” next offered to J.D.H. by Lt. Mays that, if J.D.H. were guilty of the allegations against him, he would not recommend that J.D.H. take the polygraph, was designed for one purpose only: to get J.D.H. to react exactly the way he did. Once J.D.H., hearing this warning, changed his mind and declined to take the polygraph examination, that in and of itself was an incriminating act. When J.D.H. took the advice of Lt. Mays and declined to take the polygraph, this gave Mays the opportunity to “advise” J.D.H. that, if he was not going to take the examination, he “needed” to talk to the police investigator.[1] It is clear to me that the investigative technique of the state polygrapher was tantamount to interrogation for the purpose of requiring a Miranda warning. *1129 Romine v. State, 384 So.2d 1185, 1187 (Ala.Cr.App.1980). Because a Miranda warning was not given before the polygra-pher’s pretest interrogation was conducted, I regard the actions of the polygrapher in eliciting from J.D.H. an incriminating act and an agreement to “talk” to the investigator as an important factor in assessing the voluntariness of the confession.
When a court is determining whether a confession is voluntary, it must consider the totality of the circumstances. McLeod v. State, 718 So.2d 727 (Ala.1998), cert. denied, 524 U.S. 929, 118 S.Ct. 2327, 141 L.Ed.2d 701 (1998). The court must also consider the totality of the circumstances to determine if the defendant’s will was overborne by the pressures and circumstances swirling around him. Jackson v. State, 562 So.2d 1373, 1380 (Ala.Cr.App.1990).
“To determine if a defendant’s will has been overborne, we must assess ‘the conduct of the law enforcement officials in creating pressure and the suspect’s capacity to resist that pressure’; ‘[t]he defendant’s personal characteristics as well as his prior experience with the criminal justice system are factors to be considered in determining [the defendant’s] susceptibility to police pressures.’ Jackson, 562 So.2d at 1380-81 (citations omitted).”
McLeod v. State, 718 So.2d at 730.
J.D.H. was advised of his Miranda rights prior to his first police custodial interrogation on November 6. He then remained in jail until he was taken from confinement and delivered to the state po-lygrapher on November 22. After a 16-day lapse between the time he was advised of his right to remain silent and to have the assistance of a lawyer, J.D.H. was required to answer a questionnaire containing accusatory questions that directly called for incriminating answers as a prerequisite for the polygraph test he had consented to take. He was then advised by the “polygraph expert” that only an innocent person should submit to a polygraph and that, if he were guilty, he should not take the examination. After J.D.H. took the advice of the polygrapher as to whether he should take the examination, he also took the advice of the polygra-pher that he “needed” to talk to the police investigator.
I want to make my position on the po-lygrapher’s techniques completely clear. Had the polygrapher readvised J.D.H. of his Miranda rights at the beginning of the pretest interview, I would have no hesitation in concluding that the investigation techniques employed by the polygra-pher were proper and that they did not result in an involuntary statement. Campbell v. State, 718 So.2d 123, 136 (Ala.Cr.App.1997), cert. denied, 718 So.2d 123 (Ala.), cert. denied, 525 U.S. 1006, 119 S.Ct. 522, 142 L.Ed.2d 433 (1998). However, because there had been a lapse of 16 days since J.D.H. had been advised of his rights, which J.D.H. had spent in jail, the polygrapher’s investigative techniques exacerbated the situation and created an atmosphere in which J.D.H.’s will was overborne. In light of the totality of the circumstances, I believe the trial court erred in determinating that J.D.H. was adequately informed of his rights so that his statement to Investigator Rogers was voluntary. I believe the police should have been required to readvise J.D.H. of his Miranda rights prior to any custodial interrogation on November 22. Without such a readvisement of his rights, I do not believe any incriminating statement or act made by J.D.H. on that day would be voluntary and admissible into evidence against him. I therefore, must respectfully dissent. Hollander v. State, supra.

. It is obvious from the record that J.D.H.’s response to Lt. Mays’s advice was exactly what Mays was trying to achieve, because he then informed Investigator Rogers that J.D.H. had "confessed.” It is also obvious from the techniques used by Lt. Mays that he was aware that, unlike the polygraph test results themselves, any incriminating statements made by J.D.H. in a pretest interview could be admissible in evidence against him.