JOINER, Judge.
Darrius Javon Frye was convicted of first-degree rape, see § 13A-6-61,' Ala. Code 1975, and first-degree sodomy, see, § 13A-6-63, Ala.Code 1975. The trial court sentenced Frye to life imprisonment for' each conviction pursuant tb the Habitual Felony Offender Act, see § 13A-5-9, Ala.Code 1975.[1]' Frye was ordered to pay a $50 crime victims’ compensation assessment, court costs, and restitution;

Facts cmd Procedural History

The State’s evidence at trial tended to show that, on. August 10, 2013, Frye forced A.A.[2] to engage in vaginal and anal intercourse with him. A,A. testified that Frye is her ex-husband[3] and the father of her son, L.F. A.A. stated that she and .Frye did not live together after 2011 and.that, on the morning of August 10, ,2013, she and Frye had an argument during a telephone call after she requested that he pay child support. A.A. testified:
- “He was making statements -like: I shouldn’t put him on child support. He’s going to show my ass— [He said,] - ‘You’re stupid. You ain’t going to get no money from me. Fm not going to work to make, sure .you don’t get no money.’ •• -
[[Image here]]
“In the middle of his ranting, he was — I guess I wasn’t responding the way he ivanted me to because J was saying I’m not worried about it. [I said,] ‘I’m just going to - let the court system in Brewton handle it, take care of it. You don’t do anything for him anyway.’ And -he was like, Well, I’m *1158 going to show you. I’m going to show your ass.’ And at that, point I hung up on him.”
(R. 180). A.A. testified that, sometime after the argument, Frye appeared at. her home and that L.F., who was three years old at the time, let him inside without her knowledge. A.A. testified that she told Frye to leave but that he closed and locked the front door instead. A.A. testified that she attempted to call emergency 911, but that Frye “snatched [her cell phone] out of [her] hand and slung it down on the couch.” (R. 182.) A.A. testified that Frye then put her in a headlock and forced her into her bedroom and onto her bed. A.A. testified:
“A. So at this point, I’m resisting him and he choked me again. Choked me back down to the bed. I’m steady trying to get him off me. Choke me back down to the bed. 'Every attempt it seemed like I made, he choked me harder, you know, to the point where I said to myself, ‘Well, he’s going to make a mistake and kill you.’
“So I kept trying to get him off me, but at that point he: kind of pinned my arms down. And was still choking me at the same time. Pinned me down with his elbows.
“And then that’s when he started trying to pull off my clothes and stuff. And I made every attempt to get him off me, but it just didn’t work. At that—
“Q. Were you telling him to stop?
“A. Uh-huh, I was telling him to stop.
“Q. Telling-him no?
“A. Telling him no. [I said,] ‘I’m going to call the police on you. You’re going to go to prison. This time you’re going to go. You’re going to go to jail. I want you to stop. Do you see what you’re doing? Think about what you’re doing.’
“Q. Was he — was he saying anything during that attack?
“A. Yeah. [He said,] ‘I’m going to show you.’ ..."[I]t was basically, ‘I’m going to show you that this is mine.’ And really, like,' ‘Ain’t nobody going to believe you, you married to me,’ type 'thing. ' And, ‘I’m going to do you dirt.’ That’s what he said.
[[Image here]]
“... So he was, like, the last time he said, ‘I’m going to do you dirt,’ he kind of had me angled at a certain way where it was like if I moved, I. knew — it just hurt too bad. He had me. Pretty much he overpowered me.
“And at that point, that’s when he was attempting — he was pulling his pants down and stuff. And he was still choking me with one hand. The other hand, every time he’d get one loose, he would pull his pants down and try to get himself ready, I guess. And then that’s when he penetrated me.
“Q. Was that penetrate you vaginally?
“A. Vaginally at first.
“Q. Okay. So he- put his penis into your vagina?
[[Image here]]
“A.-’ Uh-huh:And then he did that for a few times. And then I kept — I guess he got aggravated because I just kept fighting him. And then he was like, ‘I’m going to do you dirt. I’m going to do you dirt. I’m going to show you.’ And at..that point, that’s when; he removed himself from my vagina and penetrated into my anus
(R. 185-87.)
Officer Mary McNew and Officer Steve Morris of the City of Atmore Police Department testified that they responded to A.A.’s home after she called 911. to report that she had been sexually assaulted. Of *1159 ficer McNew testified that A.A. was “visibly upset” and.that, in.AA’s bedroom, “it appeared that there was a small type struggle, or just the appearance of something happened on top of the covers of the bedroom.” (R. 62, 64.) Officer Morris testified that A.A. “was crying, real upset. And had her arms crossed to herself. And just real upset.” (R. 75.) Officer Morris testified that he questioned A.A. and that she informed him that Frye was the person who had raped her.
. Dr. William Harris testified that, on August 10, 2013, he was working in the emergency room at Atmore Community Hospital. Dr. Harris testified that he performed a sexual-assault examination of A.A. and prepared a rápe kit with evidence collected from that examination. Dr. Harris testified that A. A. “was upset and crying when she first arrived” and that “[h]er heart rate was ábout 101.” (R. 107, 108.)' Dr. Harris testified 'that, during the examination, he found blood “right outside of the vagina” and that his observation was normal because A.A. had disclosed to him that she was experiencing her menstrual period at that time. (R. 108.) .Dr. Harris also testified, however, that he “found blood on the anus itself, which is a bit unusual.” (R. 109.)
Frye testified that he was at :A.A.’s house on the morning of August 13, 2013, and that he had sexual intercourse with A.A. while he was there. Frye testified, however, that A.A. had consented .to the intercourse.and that he -had not forced her to participate.

Discussion

On appeal, Frye contends, among other issues, that the trial court abused its discretion and violated Rule 404(b), Ala. R. Evid., because, he says, it erroneously admitted collateral-bad-act evidence to prove his character and to prove that he acted in conformity therewith on the date of the alleged offense. Specifically, he claims that A.A.’s testimony with respect to an incident that occurred on July- - 8, 2012, wherein he physically assaulted A.A;, was not admissible under the exceptions to the general exclusionary rule to prove his motive, intent, or pattern of violence against A.A. Because we reverse Frye’s conviction on-this basis, we do not address the-remaining issues he raises on appeal.
The State filed a pretrial notice to introduce evidence of Frye’s prior bad acts pursuant to Rule 404(b), Ala. R. Evid. Specifically, the notice stated that “[o]n July 8, 2012; [Frye] unlawfully entered the home of [A.A.], his wife, and choked and otherwise assaulted her. This evidence will be offered to prove the Defendant’s motive, intent, and pattern of violence against [A.A.] ” (C. 52.) Frye thereafter filed an objection to the State’s notice on the grounds that “[t]he July 8, 2012, alleged incident does not prove any Rule 404(b) purpose” and “[t]he July 8, 2012, alleged incident does riot prove motive or intent for this alleged August 10, 2013, completely separate incident.” (C. 56.)
Immediately before trial, the trial court addressed the State’s notice and Frye’s objection. The State argued:
“Judge,, specifically, [A.A.] is the victim in this case and she had this history with Mr. Frye. They were married, separated, estranged. She was living on her own in July [2012]. .Mr. Frye entered her home, committed , the acts of domestic violence against her at. that time.
[[Image here]]
“And just a year and one month later, after,those charges were dropped, he’s back in her home and commits this crime.
“Now, motive and intent. Motive is always relevant, and intent is in element that we have to prove.. And we were offering that to show this history be *1160 tween, specifically [A.A.] and Mr. Frye, to shoW his motive and intent.
“Rapé and sodomy and domestic violence are often not sexual in nature, but often controlling or domineering as far as the husband and wife relationship or boyfriend-girlfriend relationship. So we feel that’s relevant to show their history and to show his motive in coming to this case,”
(R. 13 — 14.) Frye’s. defense counsel replied:
‘Tour Honor, first of all, they say that they want to use this July 8, 2012, incident, will be offered to prove the defendant’s motive, intent, and pattern of violence against [A.A.] Pattern of violence against [A.A.] is another term for, we want to prove his character and prove he acted in conformity therewith.
“That is no.t under [Rule] 404(b). .It doesn’t say anywhere in there how it can be used to show a pattern or practice. It says motive, intent, lack of accident, mistake, things like — it doesn’t say pattern of violence or pattern of conduct bécause that’s proving conduct in trying to prove he acted in conformity therewith. It doesn’t go to motive.
“They had — in this case, [A.A.], iñ her statement, says the motive of this whole incident [on August 10, 2013,] was to retaliate against her about child support. That’s what the State’s statement in this case says. I understand that.
“But this other incident [on July 8, 2012,] it doesn’t — it doesn’t comé close to being [Rule] 404(b) —
"....
“I think it is not [Rule] 404(b) evidence. And I think their grounds for trying to get it in is in direct opposition to what [Rule] 404(b) says. You can’t use to prove character. And that’s what they’re trying to do.”
(R. 16-18.) The trial court overruled Frye’s objection.
Before A.A. testified as to the incident that occurred on July 8, 2012, Frye objected twice on the ground that her testimony violated Rule 404(b), Ala. R. Evid. The trial court overruled both objections. A.A. then testified that, on July 8, 2012, she went to a party in Bay Minette. A.A. testified:
’ “But while I was at the gathering in Bay Minette, I did see Darrius Frye.... And I guess he got upset because he saw me in there and I didn’t acknowledge him or — but need I remind you, we Weren’t together.
“Arid I walked back out to my car with some friends to go back home to Atmore. And he walked up to my car and he said, What are you doing here? I’m going to show you. . I’m going to show you.’ So, you know, I laughed it off, blew it off. Just came back to At-more. . Dropped the friends off. Came back home.” - .
(R.' 168). A.A. -testified that when she arrived at her house, Frye was inside. A.A. testified:
“And when he pulled the door open and ■snatched me in,' I was kind of in shock. I was thinking; ‘Where is my kid and where is the babysitter?’
. “I walked in 'my house, in my living room. And my babysitter, which was my roommate, she was standing’ in the bathroom dying. And my son was over on the couch. -And [Frye] was in the living room. And at that time he hit me and pushed me down on the couch and it was, like, choking me. -
“And he was kind of going in- between me and Jessica, which was my roommate. She was standing in the bathroom, I guess he was faying to keep-his eye on both of us at the- same time. And when he would start to go towards her, at her, I guess he would see that I was trying to make a break for it.
*1161 “I was just trying to get out' of . the residence and just get to a phone. Because at that time he had kind of knocked me down, I didn’t have, my phone-on me.
“So I managed, to escape and run across the street to the neighbors across the street. And at that time, I guess he took off behind me., I could hear him behind me. . And. I made it, to the doorway and the dogs — I could hear the dogs in the house barking. By that time he hit me on the back of the head and I kind of fell over into the doorway....”
(R. 169-70.) Frye requested a limiting instruction as to how the jury could consider A.A.’s testimony. The, trial court stated:
“Ladies and gentlemen, I want you to kind of follow what I’m going to explain to you. You have been hearing questions to this witness regarding an event allegedly taking place in July of 2012, which was about, what, a year before the alleged act here. Year and a month maybe.
“Now, I want to make sure that you understand that the deféndant is not on trial today for anything allegedly occurring in July of 2012. That’s not what he’s charged with. He is before you today because there is a charge, as you know, rape and sodomy allegedly occurring in August of 2013.
“I have permitted this line of questioning, not to permit the State to use it as far as getting you mad at the defendant for what occurred or didn’t occur in July of T2, but limiting it only for the purpose — and we have a rule in our evidence rules,- these rules all have numbers and names, but it’s 404(b).
“Rule 404(b): And in essence, evidence of other alleged wrongs or alleged crimes or alleged acts, that thosé are not to be used by the jury to prove the character of a defendant and that he did or did not act in conformity with this character. It’s limited only to the extent that it’s being offered by the State — and this line of questioning is evidence-that’s coming in, it’s being-offered by the State to prove the defendant’s motive, or his intent, or pattern of violence against this alleged victim. So I’m limiting your understanding of what this is all about.
“He’s not on trial for having any charges against him before you for anything in July of 2012. He’s not on trial for that. And you may only consider this line, of questioning in regard to matters as you may deem it, and you may deem it’s — you give it the weight you think is appropriate; no weight or some weight. But that the evidence is being offered only- to prove, from the State’s perspective, the defendant’s motive, intent, and pattern of violence against the alleged victim. And that’s all you can consider that line of- questioning. And it may yet continue on á little bit.”
(R. 175-76.) Frye objected to the trial court’s instruction on the ground that A.A.’s testimony was not admissible to prove motive, intent, or a pattern of violence against A,A. The trial court overruled his objection.
A. Admissibility of Prior-Bad-Act Evidence
‘“The admission or exclusion of evidence is a matter within the sound discretion of the trial court.’ Taylor v. State, 808 So.2d 1148, 1191 (Ala.Crim.App.2000), aff'd, 808 So.2d 1215 (Ala.2001). ‘The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s ’ determination on that question will not be reversed’ except upoh a clear showing of abuse of discretion.’ Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000). This is equally true with *1162 regard to the admission of collateral-bad-acts evidence. See Davis v. State, 740 So.2d 1115, 1130 (Ala.Crim.App.1998). See also Irvin v. State, 940 So.2d 331, 344-46 (Ala.Crim.App.2005),”
Windsor v. State, 110 So.3d 876, 880 (Ala.Crim.App.2012).
“Further, Rule 45, Ala. RApp, P., provides:
“ ‘No judgment may be reversed or set aside ... on the ground of ... improper admission or rejection of evidence, :.. unless in the opinion of the court to which the appeal is taken or application is made, after examination of the entire case, it should appear that the error complained of has probably injuriously affected substantial rights of the parties.’
“[The Alabama Supreme] Court stated in Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993):
“‘[T]his Court has stated that the reviewing court must determine whether the “improper admission of the evidence ... might have adversely affected the defendant’s right to a fair trial,” and before the reviewing court can affirm a judgment based upon the “harmless error” rule, that court must find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant’
“See also Ex parte Greathouse, 624 So.2d 208, 210 (Ala.1993) (noting that the proper harmless-error inquiry asks, absent the improperly introduced evidence, “‘is it clear beyond reasonable doubt that the jury would have returned a verdict of guilty?”’ (quoting United States v. Hasting, 461 U.S. 499, 511, 103 S.Ct. 1974, 76 L.Ed.2d 96 (1983))),”
Towles v. State, 168 So.3d 133, 140 (Ala.2014) (emphasis in original).
The State argues 'on appeal that A.A.’s testimony regarding. Frye’s prior physical assault on her was admissible under the motive, intent, and pattern.'exceptions to the general exclusionary- rule set out in Rule 404(b), Ala. R. Evid.
Rule 404(b) provides, in relevant part:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such ' as proof of motive, opportunity, intent, ' preparation, plan, knowledge, identity, of'absence of mistake or accident....”
The Alabama Supreme Court has held:
“ ‘ ‘“On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination or propensity to commit the type of crime for which he Is being tried. This is a general exclusionary, rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.’ ” Pope v. State, 365 So.2d 369, 371 (Ala.Crim.App.1978), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01. (3d ed. 1977) “ ‘This. exclusionary rule is simply an application of the character rule which forbids the State to prove the accused’s bad character by particular deeds. The .basis for, the rule lies in the belief that the prejudicial effect of prior crimes .will far outweigh any probative value that might be gained from them.. Most agree that such evidence of prior crimes has almost an irreversible impact upon the minds of the jurors.’ ” Ex parte Arthur, 472 So.2d 665, 668 (Ala.1985), quoting McElroy’s supra, § 69.01(1),...
"'... The well-established exceptions to the exclusionary rule include: (1) rel *1163 evancy to prove identity; (2) relevancy to prove res gestae; (3) relevancy to prove scienter; (4) relevancy to prove intent; (5) relevancy to show motive; (6) relevancy to prove system; (7) relevancy to prove malice; (8) relevancy to rebut special defenses; and (9) relevancy in various particular crimes. Willis v. State, 449 So.2d 1258, 1260 (Ala.Crim.App.1984); Scott v. State, 353 So.2d 36 (Ala.Crim.App.1977). However, the fact that evidence of a prior bad act may fit into one of these exceptions will not alone justify its admission. “‘Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects.” ’ Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985), quoting United States v. Turquitt, [557 F.2d 464] at 468-69 [(5th Cir.1977)].”
Ex parte Jackson, 33 So.3d 1279, 1284-85 (Ala.2009) (quoting Robinson v. State, 528 So.2d 343, 347 (Ala.Crim.App.1986)).
1. Motive
“Regarding the motive exception to Rule 404(b), [the Alabama Supreme] Court has stated:
“ ‘ “Motive is an inducement, or that which leads or tempts the mind to do or commit the crime charged.” Spicer v. State, 188 Ala. 9, 26, 65 So. 972, 977 (1914). Motive is “that state of mind which works to ‘supply the reason that nudges the will and prods the mind to indulge the criminal intent.’ ” C. Gamble, Character Evidenced[: A Comprehensive Approach], at 42 [(1987)]. “Furthermore, testimony offered for the purpose of showing motive is always admissible. It is permissible in every criminal case to show that there was.an influence, an inducement, operating on the accused, which may have led or tempted him to commit the offense.” (Emphasis in original, citations omitted.) Bowden v. State, 538 So.2d 1226, 1235 (Ala.1988).’ ” '
Towles, 168 So.3d 133, 143 (quoting Ex parte Register, 680 So.2d 225, 227 (Ala.1994)).
The State argues that A.A.’s testimony that Frye had physically assaulted A.A. on July 8, 2012, was admissible to show Frye’s motive for sexually assaulting A.A. on August 10, 2013. Although evidence of motive is “always admissible,” the State did not show at trial and does not argue on appeal how exactly Frye’s .prior assault of A.A. naotivated him to commit the now charged offenses. The record discloses no logical explanation for how or why , Frye’s previous physical assault of A.A. influenced, induced, led, or tempted him to commit the now charged sexual-assault offenses at issue in the instant case.
A.A. did, however, testify as to the likely motive, behind Frye’s actions on August 10, 2013. A,A. stated that she and. Frye had argued about her request that he pay child support. A.A.. testified that their conversation angered him and that Frye stated, “I’m going to show you” before she hung up on. him. , A.A. testified that, shortly after the argument, Frye appeared at her home and began to act violently with her and eventually forced himself on. her. The State seems to bolster the position that Frye’s actions were in retaliation to A.A.’s request.when.it states in its brief that *1164 Frye “was angered because A.A. had filed for child support.” (State’s brief, p. 19.) Thus, the record suggests that the likely and more logical motive behind Frye’s sexual assault on A.A. was her request for child support and not Frye’s previous physical assault on A.A. See Moore v. State, 878 So.2d 328, 334, 335 (Ala.Crim.App.2003) (holding that .Moore’s prior convictions were not admissible to show motive “because’ there, was no showing that the acts underlying the prior convictions had a logical tendency to lead to an inference that Moore, because he committed these prior acts, ... was motivated, to commit the now-charged crime.”). A.A.’s testimony with respect to Frye’s actions that occurred on July 8, 2012, “shows nothing more than [Frye]’s character is bád. This is, of'course, not an acceptable purpose for admitting evidence.” Moore, 878 So.2d at 336. Therefore, A.A;’s testimony regarding Frye’s physicál ássault on her was not admissible-under the motive exception to' the general exclusionary rule.
2. Intent
“If the accused is charged with a crime that requires a prerequisite intent, collateral crimes, acts or misconduct are admissible to show that the accused possessed the necessary intent—
“It is important to note that intent may not be asserted, as a successful way to circumvent the general exclusionary rule of character, unless intent is material or of consequence to the case: This normally means that it’must be an element of the crime with which the accused is charged.... [T]he courts have made it clear that intent must be a genuine issue before it may be used as a channel through which -to admit collateral conduct of the accused. .
"...
Whenever the prerequisite intent may be inferred from the nature of the criminal act itself, evidence of other crimes is inadmissible if offered to prove such intent.”
C. Gamble, McElroy’s Alabama Evidence § 69.01(5)(6th ed.2009)(footnotes omitted).
The State argues that the evidence .of Frye’s physical assault on A.A. in July 2012. was admissible. under the intent exception to the general exclusionary rule. Intent, however, is not an element of either first-degree rape or first-degree sodomy. Section 13A-6-61, Ala.Code 1975, provides, in relevant part, that “[a] person commits the crime of rape in the first degree if ... [h]e or she engages, in sexual intercourse with a member of the opposite sex by forcible compulsion.” Section 13A-6-63, Ala.Code 1975, provides, in relevant part,, that-“[a] person commits the crime of sodomy in. the first degree if ... [h]e engages in deviate sexual intercourse with another person by forcible compulsion.”
This Court has stated:

“[B]oth sodomy and rape proscribe the prohibited act alone without regard to the actor’s intent.

“As Mitchell v. State [, 473 So.2d 591 (Ala.Crim.App.1985),] points out, although sexual gratification is a definitional component of the act constituting the offense of sodomy, it is not an intent requirement.' Neither is there an intent requirement for rape. Title 13A, Chapter 6, Article 4 of our Criminal Code defines six sex offenses, namely: rape, sodomy, sexual misconduct, sexual abuse, indecent exposure, and enticement. With the exception of rape, sodomy, -and -sexual misconduct (which is defined in reference either to rape or sodomy), all of these offenses proscribe conduct performed with an intent characterized as to ‘gratify sexual.desire’ or ‘lascivious.’ Why did the Alabama legislature omit the ‘sexual gratification’ or ‘lascivious’ intent requirement from only *1165 rape and sodomy? The answer is clear. One engages in an act of sexual intercourse under the circumstances set out in the rape statutes, or in an act of deviate sexual intercourse under the circumstances outlined in the sodomy statutes ‘at his peril.’ See §§ 13A-6-61 and 13A-6-62 (Commentary at 201); §§ 13A-6-63 and 13A-6-64 (Commentary at 205). That -is, all ads of sexual intercourse or deviate sexual intercourse accomplished by force or perpetrated on a child of tender years are proscribed, without regard to intent. See Hooper v. State, 106 Ala. 41, 17 So. 679 (1895). Society, speaking through the legislative body, deems these acts sufficiently harmful to justify criminalizing their performance alone, irrespective of intent. Cf. United States v. Balint, 258 U.S. 250, 42 S.Ct. 301, 66 L.Ed. 604 (1922) (drug seller guilty of violating federal Narcotics Act even though he was unaware product contained opium). The rape and sodomy statutes thus approach ‘mala prohibita’ or strict liability offenses in their outright prohibition of certain conduct regardless of mental culpability. See' generally § 13A-2-3 (Commentary at 27).
“In contrast, not all ‘sexual contact’ or genital exposure, or enticement of children is or could, constitutionally, be proscribed under the other sexual offense statutes. ‘Touching of the sexual or other'intimate parts of a person not married to the actor’ frequently occurs when people are jostled together on a crowded bus, when someone performs artificial respiration, or when a doctor examines a patient. Genital exposure is common in locker rooms,’and strictly speaking, enticement of children into a vehicle is practiced every day by harried parents ready to leave the mall.”
King v. State, 574 So.2d 921, 934 (Ala.Crim.App.1990) (emphasis added).
Because intent is not an -element of either first-degree rape or first-degree sod-omyv A.A.’s testimony with respect to Frye’s previous assault upon her was not properly admissible under the intent exception to the general exclusionary rule.
3. Pattern of Violence Against A. A.
“Evidence of the accused’s commission of another crime or act is admissible 'if such evidence, considered with other evidence- in the case, warrants a finding that both the now-charged crime and such other crime or act were com-toitted in keeping with or pursuant to a single plan, design, pattern, scheme, or system. . This rule is applicable whether such plan, design, pattern, scheme, or system is narrow and specific in scope or is measurably, broad and general, in scope. The majority, of decisions speak of this as the plan or scheme exception. Others, however, refer to it as proving a system or pattern
“The present purpose differs from knowledge or intent in several respects. First, the plan, design, , scheme or pattern is not,.an element of the crime charged and, consequently, is always material or of consequence in the case. Such ever-present materiality causes the application of the exception to focus upon whether the other acts do indeed have a tendency to show a plan or scheme. A. second difference lies in the fact that a single collateral crime or act could be more sufficient to show knowledge or intent but, in contrast, it generally takes more than a single, act to form a plan or scheme. Last, a greater degree of similarity between the charged crime and the collateral act is required when the latter is offered to prove plan or scheme rather than intent.”
C. Gamble; McElroy’s Alabama Evidence § 69.01(6)(6th ed.2009)(foptnotes omitted).
This Court has stated: -
*1166 “ ‘[T]he common plan, scheme, or design exception is “essentially coextensive with the identity exception," Ex parte Darby, 516 So.2d 786, 789 (Ala.1987), and “applies only when identity is actually at issue.” Campbell v. State, 718 So.2d 123, 128-29 (Ala.Crim.App.1997), cert. denied, 525 U.S. 1006, 119 S.Ct. 522, 142 L.Ed.2d 433 (1998).’ ”
Tariq-Madyun v. State, 59 So.3d 744, 753-54 (Ala.Crim.App.2010) (quoting Lewis v. State, 889 So.2d 623 (Ala.Crim.App.2003)).
Frye testified that he and A.A. did have sexual intercourse on August 10, 2013; therefore, the identity of A.A.’s attacker was not at issue in this case. The material question in this case, then, was whether the intercourse between A.A. and Frye was consensual or whether it was accomplished by forcible compulsion.
In any event, the State’s claim that A.A.’s testimony of Frye’s prior physical assault on her was admissible to show his “pattern of violence against A.A.” is simply a thinly veiled attempt to introduce evidence that, because Frye violently choked and beat A.A. on a previous occasion, he must have violently raped and sodomized her on the occasion in quéstion. In other words, the State put forth, and the trial court admitted, improper evidence of Frye’s propensity for violence to show that Frye acted in conformity therewith — the purpose expressly prohibited by Rule 404(b), Ala. R. Evid. See Ex parte Casey, 889 So.2d 615, 622 (Ala.2004) (“The only tendency of the defendant’s prior convictions was the purpose prohibited by Rule 404(b), ‘to show action in conformity therewith’-that is, to show that, since the defendant dishonestly acquired property in 1995, he dishonestly acquired other property in 2000.”). This evidence/therefore, was not admissible under any exception to the general exclusionary rule of Rule 404(b), Ala. R. Evid.
B. Limiting Jury Instruction
In addition, the tidal court’s limiting instruction to the jury that it was to consider the collateral-act evidence strictly for the purposes' of motive, intent, and pattern of violence against A.A. did not cure the unfair prejudice that resulted from the improper admission of A.A.’s testimony. “A limiting curative instruction only mitigates the prejudicial admission of illegal evidence if the instruction is legally sound.” McAdory v. State, 895 So.2d 1029, 1036 (Ala.Crim.App.2004). A.A.’s testimony was not properly admissible for motive, intent, or pattern of violence against A.A., and the trial court’s limiting instruction erroneously allowed the jury to consider A.A.’s testimony for those purposes. Therefore, the trial court’s limiting instruction to the jury was incorrect. See R.C.W. v. State, 168 So.3d 102, 108 (Ala.2014) (“[T]he trial court’s limiting instruction in this case was erroneous because it permitted the jury to consider the collateral-acts evidence for purposes not at issue in this particular case.”).
C. Harmless-Error Analysis
Rule 45, Ala. R.App. P., provides:
“No judgment may be reversed or set aside, nor new trial granted in any civil or criminal case on the ground of misdirection of the jury, the giving or refusal of- special charges or the improper admission, or rejection of evidence, nor for error as to.any matter of pleading or procedure, unless in the opinion of the court to which the appeal is taken or application, is made, after an examination of the entire cause, it should appear that the error complained of has probably , injuriously . affected substantial rights of the parties.”
The Alabama Supreme Court has held:
“‘[B]efore the reviewing court can affirm a judgment based upon the “harmless error” rule, that court must *1167 find conclusively that the trial court’s error did not affect the outcome of the trial or otherwise prejudice a substantial right of the defendant.’ Ex parte Crymes, 630 So.2d 125, 126 (Ala.1993) (emphasis omitted [in Casey]). ‘ “The basis.for the [exclusionary] rule lies in the belief that the prejudicial effect of prior crimes will far outweigh any probative value that might be gained from them. Most agree that such evidence of prior crimes has almost an irreversible impact upon" the minds of the jurors.” ’ Ex parte Cofer, 440 So.2d 1121, 1123 (Ala.1983), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01(1) (3d ed.1977), also quoted in Hobbs v. State, 669 So.2d 1030, 1032 (Ala.Crim.App.1995).
“ ‘The Staté has no absolute right to use evidence of prior acts to prove the elements of an offense or to buttress inferences created by other evidence. Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant. It interjects a collateral issue into the case which may divert the minds of the jury from the main issue. Kilpatrick v. State, 51 Ala.App. 352, 285 So.2d 516 (1973), cert. denied, 291 Ala. 628, 285 So.2d 525 (1973). Therefore, the admission of such evidence constitutes reversible error. Hinton v. State, 280 Ala. 48, 189 So.2d 849 (1966).’
“Ex parte Cofer, 440 So.2d at 1124. ‘ “The tendency of such evidence [of another distinct crime] to work great injury to the accused renders its admission reversible error, unless it is brought within one of the exceptions recognized by law.” ’ ”
Casey, 889 So.2d at 621-22.
In Casey, the defendant was convicted of one count of first-degree receiving stolen property and one count of second-degree receiving stolen property. Casey was arrested after “police officers found stolen tools, stereo equipment, and compact discs in Casey’s girlfriend’s apartment, where Casey often stayed, and in Casey’s girlfriend’s car, which Casey often drove.” 889 So.2d at 616. At trial, the State introduced evidence of Casey’s prior convictions for theft of property and unauthorized use of a credit card. The State offered that evidence under the. intent and knowledge exceptions to Rule 404(b), Ala. R. Evid. The trial court-issued the following limiting jury instruction: “[Y]ou cannot consider the previous crimes of the Defendant as evidence that he committed the now-charged crimes but only as evidence .of the elements of knowledge.and intent.” Id. at 617.
The Alabama Supreme Court held that the admission of. Casey’s prior convictions violated Rule: 404(b), Ala. R. Evid., because there was “no logical connection, between his. prior theft or his prior unauthorized use of, a credit card and his knowledge of the presence, ownership, or stolen character of any of the items he was being tried for receiving in the case now before us.” 889 So.2d at 621. Likewise, the Court stated that a logical connection was also lacking between Casey’s intent “with the property or the credit card of his prior convictions and what, if anything the defendant intended with the myriad of items, stolen and not stolen, in his girlfriend’s apartment, in her car, or indeed in any of the places the defendant might have frequented.” Id. The Court concluded that “[t]he erroneous admission of the defendant’s prior convictions into evidence substantially increased the likelihood that he would be convicted” and that “[t]he ‘limiting’ instruction given by the trial court to the jury did not ameliorate the prejudicial effect of the erroneous admission of the defendant’s prior convictions.” Id. at 622.
Turning now to the instant case, the ultimate issue at trial was whether the *1168 sexual intercourse and deviate, sexual intercourse between A.A. and Frye. was achieved by forcible compulsion. Frye testified that it was consensual; A. A. testified that it was not. Multiple witnesses testified that A.A. was visibly upset after reporting that she had been raped. Officer McNew testified that she saw what appeared to be signs of a “small type-struggle” in A.A.’s bedroom. Dr. Harris testified that, during his examination of A.A., he found blood on her anus and that that was “unusual.” Aside from A.A.’s and Frye’s'testimony, however, there is no evidence that speaks directly and conclusively to the issue of forcible compulsion. The outcome of the case, therefore, depended essentially on the jurors’ perceptions of the witnesses’ credibility. A.A.’s testimony of Frye’s physical assault on her- “was not - ‘so innocuous or cumulative that it could not have contributed substantially to the adverse verdict.’ ” McAdory, 895 So.2d at 1037. Based on the totality of the evi-derice in this case, it appears that the erroneous admission of the improper character evidence-was prejudicial to Frye and “probably injuriously affected. [his] substantial rights.” Rule 45, Ala.. R.App. P. In other words, it’ is not clear that the jury would have returned a guilty verdict without first hearing A.A.’s testimony with respect to Frye’s prior physical assault on her.

Conclusion

We conclude that evidence of Frye’s pri- or assault on A.A. was prejudicial and that its impact substantially outweighed its probative value. Based on the foregoing, we reverse the judgment of the trial court and remand Frye’s case for further proceedings consistent with this opinion.
REVERSED AND REMANDED.
WINDOM, P.J., and WELCH and BURKE, JJ., concur.
KELLUM, J., concurs in the result.

. To protect the victim’s anonymity, we are using hér initials. See Rule 52, Ala. R.App. P.

. A. A. testified that, at the time of the trial, she and Frye were divorced but that, on August 10, 2013, the two were estranged but legally married.