WELCH, Judge.
The appellant, Brandon Yates, was convicted, as an accomplice, of murdering Brandarius Hill, see § 13A-6-2, Ala.Code 1975; two counts of attempting to murder Tyris Miller[1] and Jamar Thompson, see § 13A-6-2 and § 13A-4-2, Ala.Code 1975; and shooting into an occupied vehicle, see § 13A-11-61, Ala.Code 1975.[2] Yates was sentenced to 40 years in prison for the murder conviction, 30 years for each attempted-murder conviction, and 10 years for the conviction for firing into an occupied vehicle, the sentences to be served concurrently.
The State’s evidence tended to show that in the early morning hours of September 18, 2011, police were dispatched to the Selebras Club (“the Club”), a nightclub in Silas, Alabama, in response to a 911 emergency call that a shooting had taken place in the parking lot of the Club. Dr. Erin Barnhardt, Deputy Chief Medical Examiner of the Mississippi State Medical Examiner’s Office, testified that Brandarius Hill died as a result of a gunshot wound to the right side of his head. (R. 208.) Testimony also established that Tyris Miller was shot in the leg and that Jamar Thompson was shot in the head, twice in the left leg, and once in his left arm.
Numerous people were in the parking lot of the Club at the time of the shootings and testified at Yates’s trial. Tyris Miller testified that he was at the Club at closing time at around 2:00 a.m. on the morning of September 18, 2011, and that he, Brandari-us Hill, Tony McGrew, and a few other people were standing in the parking lot talking. He was sitting on his car looking at his cellular phone, Miller said, when a “guy with [dreadlocks] came out of the club” and started talking to him. While he and the “guy with dreads” were, talking, a “white guy” walked between them. (Testimony established that Yates was the only person in the parking lot with dreadlocks at the time of the shootings. (R. 159.)) Miller asked the “white guy” for cigarettes, and the. guy with “dreads” started cursing and walked away. A .few minutes later Aaron Hicks grabbed him and turned him around. Miller said that he could see five or six guys standing in a line and the guy in the middle was holding what looked like an AK-47 assault rifle. He tried to move away, but Hill came up to him and put his arm around his neck. Miller said that he heard several “booms,” that Hill fell to the ground, and that he tried to get away but was shot in the leg and fell to the ground.
*1242 . Aaron Hicks , testified that he was in the parking lot of the Club when the shooting occurred and that he was with Brandarius Hill, Ladarius HiU,. Terrance Boone, and Tyrjs.-Miller. ■ Miller, he. said, was sitting on his car and “looking funny.” Hicks asked what-was happening and Miller told him that one “dude” thought he was talking to him and got mad when he started talking to someone else. Hicks told Miller that he needed to talk with the “dude” but Miller thought there was no problem. Hicks testified that he thought he saw a guy running up with a gun so he took off running. The confrontation was over' ' Hicks said, when a “tall dudé” came ovér and made the other “dude” go toward the road, so he went back to his car. He heard Miller call Brandarius Hill and that is when the shooting started. The gun, he said, “looked like an AK with a drum on the bottom of it.” (R. 188.) There were two guns being shot, he said, the first "gun was the AK and then a pistol. After the shooting stopped he saw a white Tahoe[3] sport-utility vehicle speeding off toward Mississippi.' When he went back to his car, he said, he saw Miller holding his leg and Brandarius Hill face down on the ground. Hicks testified 'that the guy shooting the gun was Melton Crosby.
Kelvin Hill testified that he was in the parking lot of the Club at the time of the shootings and that he saw Melton Crosby walk to his truck and come back with a gun. Crosby, he said, told him that he was going to talk with Tyris Miller. A' minute later, he said, he heard gunshots. The shots were coming from two guns, he said—a pistol and an AK-47. Hill testified' that Yates was at the Club that night, that he had his hair in dreadlocks, and that he had gold teeth.
Yavanda London testified that she was at the Club at the time of the shootings and that-she-was with two friends. She testified that she knew Cedrick Jones and Melton Crosby and that she knew Yates by sight. London testified that on the night of the shooting Yates was with Jones and Crosby and that they walked out of the Club together at closing time. About 15' minutes after the Club closed she was in the parking lot with her friends when they heard shots by “Aaron’s- [Hicks] car,” a green Crown -Victoria. London testified that there were many shots fired and that some gun fire was coming from a vehicle, a Tahoe. After the shooting stopped the Tahoe sped off toward Mississippi.
Jamar Thompson testified that he-was at the Club on the evening of the shooting and that when the Club closed he went to the parking lot. He was talking to Bran-darius Hill when his cousin told him to get into the car because something was about to happen. About five minutes later he heard gunshots, “like, a machine gun.” The shots, he said, were coming from a Tahoe. (R, 171.) Thompson said that he was shot in the head, twice in the left leg, and once in his left arm and that he spent three and a half weeks in the hospital. (R. 173-75.) Thompson said that he had to have rehabilitation to learn to walk, talk, and swallow again.
Quinton Whigham testified that he was at the Club in the parking lot at the time of the shootings, that the shooting started near Aaron’s car, that he saw the guy shooting the gun, and that the guy was Melton Crosby shooting what he described as the “long gun,” Multiple shots were fired, he said, and evéryone starting ducking behind and in the cars. Whigham said *1243 that he observed a white Tahoe leave the parking lot and head toward Waynesboro after the shootings.
Danielle McGrew testified that she was at the Club in the parking lot at the time of the shootings and she was in a black Tahoe talking to two other people when they heard shots. They drove out of the lot and headed towards Mississippi. McGrew said that when they were about a half mile from the Club when a couple of vehicles pulled behind them and then passed them. The vehicles were both white, he said, and were traveling at a “high rate of speed” toward Mississippi, (R. 201.)
Dylan Mazingo testified that he was incarcerated with Yates at the Marengo County jail in October 2011, He testified that he overheard Yates say that “[tjhere wouldn’t be no evidence found because they wore socks on their hands, no fingerprints on the bullets because of the socks.” (R. 276.) Mazingo said that he also heard Yates say that “[tjhey got away with it once and they would get away.with it again.” (R. 276.) After Mazingo spoke with police, Mazingo testified, Yates told him that he better be careful what he said because he knew where his family lived. (R. 277.) Mazingo said that he also overheard Yates make telephone calls in which he discussed cleaning his house or getting “stuff out of his house.”
Darryl Linder, a special agent with the Department of Public Safety, testified that he seized cellular telephones from Yates and Crosby. He further testified concerning a telephone call made by Yates from the Marengo County jail. (The recording of the call and a transcript of the call were admitted into evidence.) In the call, Yates is talking to his sister and asks her to get his pistol from under his bed. Yates also telephoned his mother and told her to clean up his house and to contact everyone on his telephone list and to tell them that his phone had been seized. Agent Linder also introduced registrations from two motor vehicles, a white Chevrolet sport-utility vehicle, registered to Cedrick Jones, and a white Chevrolet Tahoe, registered to Yates.
Forensic testimony showed that 47 bullet casings, consistent with having been fired from an AK-47, were recovered from the scene and 15 nine-millimeter casings were recovered. Bullets were also recovered from 3 vehicles: 1 bullet from a Plymouth Breeze, 2 bullets from a Saturn, and 15 bullets from a Crown Victoria.
Chris Hall, a former technology examiner with the Alabama Bureau of Investigation, testified that he received several cell phones from Agent Linder so that he could analyze data on the phones. He retrieved a contact list from Yates’s phone -and a text history. A picture of a “drum for a .22 caliber rifle” was also taken from Yates’s cell phone. The other -two phones he received from Agent Linder were Crosby’s phones. On the morning of the shootings 18 calls were made from Yates’s cell phone and Crosby’s cell phone to each other from 2:41 a.m. to 4:21 a.m.—immediately after the shootings.
Choctaw County Sheriff Tom Abate testified that he interviewed Yates and that Yates admitted that he was at the Club on the night of the shooting but, he said, he left before the shooting started.
Yates argues that the circuit court erred in admitting into evidence State’s exhibit number 46, a transcript of a telephone conversation between Yates and Crosby that occurred on October 10, 2011, about three weeks after the shootings. Specifically, Yates argues that the content of the conversation was inadmissible under Rule 404(b), Ala. R. Evid. Yates further argues *1244 that the “very ambiguity of the [conversation] demonstrates that the risk of undue prejudice far outweighs any probative value that the [conversation] may have had.” (Yates’s brief, pp. 44-45.)
The record shows that before trial the State filed notice of its intent to use Rule 404(b) evidence in the form of a telephone call by Yates to Crosby while Yates was incarcerated in the county jail. (C.R.210.) At the pretrial hearing on the issue, the State argued that less than one month after the shootings Yates had a telephone conversation with Crosby in which Yates said he wanted to kill someone who had stolen his clothes. At the conclusion of the hearing, the circuit court withheld ruling on the evidence. (R. 20.) When the State sought to admit the recording of the conversation, the court allowed its admittance pending identification of the voices on the recording. The court also gave a limiting instruction that the conversation was admissible only for purposes of showing that “Yates had the intent to aid and abet Melton Crosby in the commission of these alleged offenses.” (R. 319.)
In the conversation, Yates refers to Stacy Pittman, who he claimed stole his clothes, and the following occurred:
“Brandon Yates: You already know, dude. You know what I be going. Right. (Indiscernible) stole my clothes and shit.
“[Crosby]:[4] Yea, boy (indiscernible). I wanted to get at him, you hear me, ‘bout—but you know what I’m saying, when I saw him, I said, shit, I ain’t goin’ do nothing with him. I ain’t goin’ beat him up [indiscernible]. I’ll wait ‘til my nigger get out (indiscernible) gon’ handle that (indiscernible). You know I know your clothes, cuz.

U

“Brandon Yates: Damm, man, I can’t wait ‘til I get up outta this bitch, boy. Man, that old boy—I gotta have that boy, boy. I’m telling you now (indiscernible).
“[Crosby]: (indiscernible) He-he-he-he-he went—he went over—over the barrel with that one, bro. (indiscernible).
«
“Brandon Yates: Bu um, (indiscernible) I need—I need to put a smashing on that nigger, dog. Real mother fucking clear. I need [indiscernible] to get my clothes from that boy, (indiscernible) I’m gon’ kill him.
“[Crosby]: (indiscernible) right here, man.”
(Suppl. R. 33-36) (emphasis added). The State asserted that the conversation showed that Yates and Crosby were conspiring to kill the person who had stolen Yates’s clothes, Stacy Pittman, and that that evidence tended to show that Yates had the intent to aid and abet Crosby in the shootings at the Club.
“The question of admissibility of evidence is generally left to the discretion of the trial court, and the trial court’s determination on that question will not be reversed except upon a clear showing of abuse of discretion.” Ex parte Loggins, 771 So.2d 1093, 1103 (Ala.2000).
“Evidence of prior or subsequent collateral bad acts and crimes is generally inadmissible.” Bailey v. State, 75 So.3d 171, 183 (Ala.Crim.App.2011).
“ ‘ “On the trial of a person for the alleged commission of a particular crime, evidence of his doing another act, which itself is a crime, is not admissible if the only probative function of such evidence is to show his bad character, inclination *1245 or propensity to commit the type of crime for which he is being tried. This is a general exclusionary rule which prevents the introduction of prior criminal acts for the sole purpose of suggesting that the accused is more likely to be guilty of the crime in question.” ’ Pope v. State, 365 So.2d 369, 371 (Ala.Crim.App.1978), quoting C. Gamble, McElroy’s Alabama Evidence § 69.01. (3d ed.1977).”
Robinson v. State, 528 So.2d 343, 347 (Ala.Crim.App.1986).
Rule 404(b) addresses exceptions to the general exclusionary rule and provides:
“Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, or absence of mistake or accident. ..
(Emphasis added.) “This Court has held that the exclusionary rule prevents the State from using evidence of a defendant’s prior bad acts to prove the defendant’s bad character and, thereby, protects the defendant’s right to a fair trial.” Ex parte Drinkard, 777 So.2d 295, 302 (Ala.2000).
When discussing “intent” as it relates to Rule 404(b) the Alabama Supreme Court has stated:
“Intent has been defined as ‘the ripened purpose to effect a result.’ Fuller v. State, 269 Ala. 312, 336, 113 So.2d 153, 175 (1959). Dean Charles Gamble has addressed the admissibility of collateral-act evidence pursuant to the intent exception to Rule 404(b) as follows:
‘“If the accused is charged with a crime that requires a prerequisite intent, collateral crimes, acts or misconduct are admissible to show that the accused possessed the necessary intent. This rule is based upon the theory that because the unintentional doing of an act is abnormal and unusual, the more a person does other acts similar to the act in question, the greater the likelihood that the act in question was not done inadvertently. Whether the collateral act has a tendency to show that the accused did possess the prerequisite state of mind is, of course, one of relevancy vested largely in the discretion of the trial court.’
“1 Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 69.01(5)(6th ed.2009) (footnotes omitted).”
Towles v. State, 168 So.3d 133, 155 (Ala.2014).
“[I]t is well settled that ‘“[wjhere the requisite intent is presumed or inferred from proof of the criminal act itself or where the intent of the defendant is not in issue, evidence of other crimes is not admissible.” ’ Brewer v. State, 440 So.2d 1155, 1159 (Ala.Crim.App.1983) (quoting Wharton’s Criminal Evidence § 245 at 560 (C. Torcía 13th ed.1972)).”
Horton v. State, 217 So.3d 27, 51-52 (Ala.Crim.App.2016).
Even though collateral-act evidence may be offered for the purpose of any of the grounds contained in Rule 404(b) its admission is not automatic.
“Judicial inquiry does not end with a determination that the evidence of another crime is relevant and probative of a necessary element of the charged offense. It does not suffice simply to see if the evidence is capable of being fitted within an exception to the rule. Rather, a balancing test must be applied. The evidence of another similar crime must not only be relevant, it must also be *1246 .reasonably necessary to the government’s case, and it must be plain, clear, and conclusive, before its probative value will be held to outweigh its potential prejudicial effects,’ United States v. Turquitt, 557 F.2d 464, 468-69 (5th Cir. 1977) (citations omitted).”
Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985). The balancing test discussed in Averette is now incorporated in Rule 403, Ala. R. Evid.[5]
“Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion, of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence.”
Rule 403, Ala. R. Evid. (Emphasis added.)
This Court has stated the following concerning the weighing process:
“ ‘In making ... a determination [as to whether the prejudicial effect of. the collateral-act evidence outweighs its probative value], the court should consider at least the following factors. The first is how necessary the evidence is to the prosecution’s case— i.e., whether there are less prejudicial ways of proving the asserted purpose. The availability of such alternate proof would mitigate in the direction of excluding the. more prejudicial collateral crimes or acts.. A second factor is the weight of relevancy or probative force of the evidence in terms of proving the purpose for which it is offered. Last, the court should consider ’ the effectiveness of a limiting instruction in the sense of whether it would' be effective, as a means of avoiding the prejudice of the jury’s using the act as a basis from which to -infer commission of the -charged crime, in limiting the jury’s use of the offered evidence to the stated purpose.’
"Charles W. Gamble and Robert J. Goodwin, McElroy’s Alabama Evidence § 69.02(l)(c) (6th ed.2009). .
“ ‘ “Prejudicial” is used in this phrase to limit the introduction of probative evidence of prior [or subsequent] misconduct only when it is unduly and unfairly prejudicial. State v. Daigle, 440 So.2d 230, 235 (La.Ct.App.1983).
‘““Of course, ‘prejudice, in this context, means more than simply damage to the opponent’s cause. A party’s case is always damaged by evidence that the facts are contrary to his contention; but that cannot be ground for exclusion. What is meant here is an undue tendency to move the tribunal to decide on an improper basis, commonly, though not always, an emotional one.’ State v. Hurd, 360 A.2d 525, 527 n. 5 (197), quoting McCormick, Handbook on the Law of Evidence § 185 at 439 n. 31 (2nd ed.1972).”
“ ‘State v. Forbes, 445 A.2d 8, 12 (Me. 1982).’ ”
Horton v. State, 217 So.3d at 57, quoting, in part, Averette v. State, 469 So.2d 1371, 1374 (Ala.Crim.App.1985). Other states that have rules similar 'to Rule 404(b) and Rule 403 have characterized the “unfair prejudice” discussed in Rule 403 as follows: State v. Passons, 158 Idaho 286, 292, 346 P.3d 303, 309 (2015) (“Evidence is unfairly prejudicial when it suggests a decision was made on an improper basis.”); State v. Rawlings, 159 Idaho 498, 506, 363 P.3d 339, 347 (2015) (“[Rule 403] only applies to evidence that is unfairly prejudicial because it tends to suggest that the jury *1247 should base its decision on an improper basis.”); State v. Spears, 403 S.C. 247, 253, 742 S.E.2d 878, 881 (Ct.App.2013) (“Unfair prejudice means an, undue tendency ".to suggest a decision on an improper basis.”); State v. Henderson, 107 So.3d 566, 568 (La.2013) (“The term ‘unfair prejudice,’ as to a criminal defendant, speaks to the capacity of some concededly relevant evidence to lure the factfinder into declaring guilt on a ground different from proof specific to the offense charged.”); State v. Paddock, 204 N.C.App. 280, 286, 696 S.E.2d 529, 534 (2010) (“ “Unfair prejudice” within its context means an undue tendency to suggest decision on an improper basis, commonly, though not necessarily, as an emotional one,’ ”); State v. Ericson, 159 N.H. 379, 389, 986 A.2d 488, 496 (2009) (“Evidence is unfairly prejudicial if its primary purpose or effect is to appeal to a jury’s sympathies, arouse its sense of horror, or provoke its instinct to punish, or trigger other mainsprings of human action that may cause a jury to base its decision upon something other than the established propositions in the case.”).
“Probative value gauges the strength and force of the relevancy of the evidence presented. State v. Plaster, 424 N.W.2d 226, 231 (Iowa 1988) (citations omitted).
“ ‘ “Unfair prejudice” is an undue tendency to suggest decisions by the fact finder based on an improper basis, often an emotional one. Unfairly prejudicial evidence is evidence which appeals to the jury’s sympathies, arouses its sense of horror, provokes its instinct to punish, or triggers other mainsprings of human action [which] may cause a jury to base its decision on something other than the established propositions in the case. . The appellate court may conclude that “unfair prejudice” occurred because an insufficient effort was made below to avoid the dangers of prejudice, or because the theory on which the evidence .was offered was designed to elicit a response from the jurors not justified by the evidence.’
“State v. Brown, 569 N.W.2d 113, 117 (Iowa 1997) (citations omitted).”
State v. Most, 578 N.W.2d 250, 253-54 (Iowa Ct.App.1998).
The conversation between- Yates and Crosby was, at best, confusing; a good portion of it was incomprehensible. We agree with Yates that it is not clear from the conversation that Crosby intended to aid and abet Yates in killing another person. Thus, we fail-to seé the relevance of the conversation. Also, given the disjointedness of the conversation we cannot say that the evidence was “plain and conclusive.” See Averette, 469 So.2d at 1374.
Moreover, the evidence was not necessary to the, State’s case under the theory argued .by the State. Testimony. established that Yates was in the parking lot at the time of the shootings and that he was with Crosby and Jones—his two codefen-dants. In a telephone call to his sister Yates told her to get his pistol from under his bed. Yates also telephoned his mother and asked her to clean up his- place and to contact everyone on his telephone list and tell them that police had seized his phone. Testimony suggested that what caused the shootings was a disagreement between Yates and Miller. Two white sport-utility vehicles sped- from the- scene. Yates and Crosby both drove-white sport-utility vehicles, In the hours immediately following the shootings, Yates and Crosby had cell phone contact 18 different times from 2:41 a.m. to 4:21 a.m. Yates told his.cell-mate that they would not find any-fingerprints on the bullets because he and his codefen-dants wore socks. Yates also said that he *1248 got away with it once and that he would again.
Indeed, we can conceive of only one clear purpose for admitting the conversation between Yates and Crosby into evidence—to show Yates’s propensity to kill. Alabama courts have reversed the following cases after finding that collateral-act evidence had been improperly admitted: Ex parte Jackson, 33 So.3d 1279 (Ala.2009) (holding that, in prosecution for capital murder, admission of evidence of defendant’s prior murder conviction was not admissible and constituted reversible error); Ex parte Casey, 889 So.2d 615 (Ala.2004) (holding that, in prosecution for receiving stolen property, evidence of defendant’s prior convictions for theft and unauthorized use of credit card constituted reversible error); Horton v. State, supra (holding that, in prosecution for capital murder, it was reversible error to admit evidence that defendant had used cocaine, that he had assaulted his girlfriend, and that he had assaulted his mother by choking her); Frye v. State, 185 So.3d 1156 (Ala.Crim.App.2015) (holding, in first degree rape case, that it was reversible error to admit evidence that the defendant had physically assaulted victim because intent is not an element of the first-degree rape charge); Marks v. State, 170 So.3d 712 (Ala.Crim.App.2014) (holding, in prosecution for first-degree rape, that evidence of defendant’s sexual assault of other women was not admissible and that its admission constituted reversible error); Towles v. State, 168 So.3d 124 (Ala.Crim.App.2013) (holding that, in the prosecution for capital murder, admission of testimony that defendant had assaulted son was reversible error); Bailey v. State, 75 So.3d 171 (Ala.Crim.App.2011) (holding that, in prosecution for capital murder, admission of testimony concerning defendant’s attempted theft did not fall under any exception to the exclusionary rule and was unfairly prejudicial); Hurley v. State, 971 So.2d 78 (Ala.Crim.App.2006) (holding that, in prosecution for first-degree rape, admission of defendant’s prior rape conviction was unfairly prejudicial); Upton v. State, 933 So.2d 1105 (Ala.Crim.App.2005) (holding that, in prosecution for felony DUI, it was reversible error to admit evidence of defendant’s prior DUI convictions); McAdory v. State, 895 So.2d 1029 (Ala.Crim.App.2004) (holding that, in prosecution for possession of cocaine, evidence of defendant’s two prior drug convictions was not admissible and admission was reversible error); Moore v. State, 878 So.2d 328 (Ala.Crim.App.2003) (holding that, in prosecution for capital murder, admission of evidence of defendant’s prior convictions for assault and murder was reversible error); Draper v. State, 886 So.2d 105 (Ala.Crim.App.2002) (holding that, in prosecution for trafficking in cocaine, evidence that defendant had previously been convicted of possessing cocaine was not admissible and its admission was reversible error).
As the Alabama Supreme Court has cautioned:
“The State has no absolute right to use evidence of prior acts to prove the elements of an offense or to buttress inferences created by other evidence. Evidence of prior bad acts of a criminal defendant is presumptively prejudicial to the defendant. It interjects a collateral issue into the case which may divert the minds of the jury from the main issue.”
Ex parte Cofer, 440 So.2d 1121, 1124 (Ala.1983).
After considering the entire record, we are convinced that the erroneous admission of the telephone conversation “had an almost irreversible impact on the minds of the jurors.” Evidence that Yates told Crosby that he was going to kill Stacy *1249 Pittman was certainly more prejudicial than probative, and it should have been excluded.
Moreover,
““‘Whether the improper admission of evidence of collateral bad acts amounts to prejudicial error or harmless error must be decided on the facts of the particular case.” R.D.H. v. State, 775 So.2d 248, 254 (Ala.Crim.App.1997); Hobbs v. State, 669 So.2d 1030 (Ala.Crim.App.1995). The standard for determining whether error is harmless is whether the evidence in error was “harmless beyond a reasonable doubt.” Schaut v. State, 551 So.2d 1135, 1137 (Ala.Crim.App.1989), citing Chapman v. California, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).’
“Hunter v. State, 802 So.2d 265, 270 (Ala.Crim.App.2000), ‘[T]he harmless error rule excuses the error of admitting inadmissible evidence only [when] the evidence was so innocuous or cumulative that it could not have contributed substantially to the adverse verdict.’ Ex parte Baker, 906 So.2d 277, 284 (Ala.2004).”
Horton v. State, 217 So.3d at 59. Neither can we say that the evidence was “so innocuous or cumulative that it could not have contributed substantially to the adverse verdict”—we cannot find that the admission of the Rule 404(b) evidence was harmless.
For the foregoing reasons Yates’s convictions are hereby reversed and this ease is remanded to the Choctaw Circuit Court for proceedings consistent with this opinion.
REVERSED AND REMANDED.[6]
WINDOM, P.J., and BURKE, J., concur.
KELLUM, J., dissents, with opinion.
JOINER, J., dissents.

. Tyris Miller’s name is spelled "Tyrus” and "Tyris” at various portions in the record. We have used the spelling that appears in the indictment. (C.R.719.)

. Yates's accomplices, Melton Crosby and Cé-dride Jones, were also charged. Yates was the first of the three to be tried.

. Hicks called the car a Tahoe during the majority of his testimony but once referred to it as a Yukon, (R. 188.)

. In the transcript of the telephone conversation, this person was identified as "1st male voice.” At trial, this voice was identified as that of Melton Crosby.

. ' Rule 403, Ala. R. Evid., became effective on January 1,-1996.

. Because we find reversible error regarding the Rule 404(b) issue we do not address the other issues raised in Yates’s brief to this Court.